# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

## Nos. 01-2738 and 01-2894

_____

| | | |
|---|---|---|
| BP Chemicals Ltd., an English corporation, | * * * | |
| Appellant, | * * | |
| v. | * * | |
| Jiangsu Sopo Corporation (Group) Ltd., also known as Jiangsu Sopo (Group) Corp., also known as Jiangsu Sopo (Group) Co. Ltd.; Zhenjiang Chemical Plant, a wholly owned subsidiary of Jiangsu Sopo Corporation (Group) Ltd., | * * * * * * * | Appeals from the United States District Court for the Eastern District of Missouri. [TO BE PUBLISHED] |
| Appellees, | * * | |
| Shanghai Petrochemical Engineering Co., also known as Shanghai Petro-Chemical Engineering Corporation, | * * * * * | |
| Defendant. | * | |

_____

Submitted: February 13, 2002
Filed: April 3, 2002

_____

Before WOLLMAN, RICHARD S. ARNOLD and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

This action between an English plaintiff and Chinese defendants requires us to navigate a jurisdictional minefield. BP Chemicals Ltd. sued Jiangsu Sopo Corporation (Sopo) alleging violations of the Lanham Act, the International Convention for the Protection of Intellectual Property, the Missouri Uniform Trade Secrets Act and Missouri common law. Sopo claimed immunity from suit under the Foreign Sovereign Immunities Act of 1976 (FSIA), Pub. L. No. 94-583, 90 Stat. 2891, because it is owned by the government of the People's Republic of China. The district court agreed and dismissed BP's action for lack of subject matter jurisdiction. BP Chems. Ltd. v. Jiangsu Sopo Corp., 144 F. Supp. 2d 1140 (E.D. Mo. 2001). We reverse the district court's decision and remand for further proceedings.

I

A few words about the procedural posture of this case are appropriate at the outset of our discussion, for that posture regulates our consideration of the facts. Sopo moved to dismiss BP's action on several grounds soon after an amended complaint was filed in October 2000. Sopo contended the district court lacked subject matter jurisdiction, personal jurisdiction, and should dismiss the action under the *forum non conveniens* doctrine. In this appeal, we consider only Sopo's challenge to the district court's subject matter jurisdiction, which we construe as a facial, not factual, challenge because Sopo limited its attack to the allegations in BP's amended complaint. See Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (explaining the difference between facial and factual jurisdictional challenges).

We observe that the parties presented the district court with a robust evidentiary record from which competing accounts of the underlying events can be discerned. It may seem odd, then, that we construe Sopo's motion as a facial jurisdictional challenge. Having closely examined the record, however, we believe

the parties proffered affidavits, testimony, and documentary materials to assist the district court in deciding the ancillary issues presented in Sopo's motion, questions of personal jurisdiction and *forum non conveniens*. The portion of Sopo's motion devoted to subject matter jurisdiction does not draw upon facts presented in the evidentiary record. JA 480-92. Instead, Sopo contested the district court's subject matter jurisdiction by arguing the allegations in BP's amended complaint failed to erode its presumptive foreign sovereign immunity. The district court tracked Sopo's facial challenge and did not make findings of fact pertinent to establishing subject matter jurisdiction. The manner in which the district court resolved Sopo's motion obliges us to accept as true the allegations in BP's amended complaint, Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993), so we will not delve into possible disputes of fact brought to our attention in the parties' appellate briefs.

II

BP's amended complaint reveals that this action stems from its interest in certain trade secret practices and technologies. In 1986, BP acquired Monsanto Corporation's proprietary interests in the methanol carbonylation process for making acetic acid, a chemical used in making paints, plastics, resins, pharmaceutical and agrochemical products. That process entails a combination of special design features and exotic metals that cannot be found in standard texts or design manuals. BP retains trade secret interests in these combinations, features, and technologies used to design and operate an acetic acid-producing plant employing this process.

BP has licensed its trade secrets worldwide, enabling other companies to build acetic acid production plants using the methanol carbonylation process. To build those plants, BP and its licensees often relied upon outside engineering firms (vendors) to produce high-alloy equipment and other intricate components. It appears that many of these vendors operated in the United States. The vendors operated at all

times under strict, contractual duties to maintain the secrecy of BP's methods and technologies during and after the construction process.

In the mid-1990s—the amended complaint is not specific—BP learned that Nooter Corporation in St. Louis, a vendor, had been asked to manufacture high-alloy equipment in connection with an acetic acid plant under construction in China. Through its own investigation, BP learned that other American vendors had received similar product specifications and directions to prepare materials needed in building an acetic acid plant. Those product specifications closely resembled trade secrets developed by Monsanto and BP. In some instances, the specifications disclosed to American vendors replicated typographical errors in original BP documents.

BP's investigation traced the disclosures to Sopo and Shanghai Petrochemical Engineering Company (SPECO), another government-owned business. Sopo allegedly worked in concert with SPECO to build the "921 plant" in China using BP's trade secret designs. BP believes SPECO acted as Sopo's purchasing agent by procuring sophisticated engineering products and equipment in the United States for Sopo to use in constructing the 921 plant. BP claims SPECO disclosed BP's trade secrets to American vendors to permit them to assess the cost and feasibility of manufacturing the requested components. SPECO also apparently signed contracts with several vendors to manufacture components used to build the 921 plant.

In February 1999, BP filed this action against Sopo, SPECO, and Nooter. BP quickly settled its claims against Nooter and SPECO defaulted. When Sopo moved to dismiss BP's complaint on the grounds mentioned above, BP opposed the motion and, in the alternative, moved to file a second amended complaint and to conduct additional discovery in China pertaining to jurisdictional facts. The district court reasoned Sopo was immune from suit in federal court under the FSIA and dismissed BP's action for lack of subject matter jurisdiction. The district court declined to reach Sopo's alternative personal jurisdiction and *forum non conveniens* arguments; the

-4-

district court also denied BP's motion to amend its complaint and its request for further jurisdictional discovery. BP now appeals from these adverse decisions.

III

From the earliest days of our Republic, courts have distinguished between the public and private acts of government. See Bank of the United States v. Planters' Bank of Ga., 22 U.S. (9 Wheat.) 904, 907-908 (1824). Public acts, such as punishing criminals and printing money, emanate from the power inherent in sovereignty. Private acts, such as commercial transactions, are not unique to government and could be performed by an individual. Jurisdictional consequences flow from this distinction between public and private acts. A nation is generally immune from suit in another nation's courts in matters arising from its public or sovereign acts, but not its private or commercial acts. Saudi Arabia v. Nelson, 507 U.S. 349, 359-60 (1993); Restatement (Third) of the Foreign Relations Law of the United States § 451 (1987). The FSIA endorsed this understanding of sovereign immunity: a foreign sovereign is presumptively immune from suit in federal court, 28 U.S.C. § 1604, but this presumption erodes when the suit concerns the sovereign's commercial activities and transactions, id. §§ 1602, 1605(a)(2).

Sopo is considered a "foreign sovereign" because it is owned by the government of the People's Republic of China. See id. § 1603(a)-(b). Though Sopo is ostensibly immune from suit, BP believes the district court possessed subject matter jurisdiction because its action satisfied two of the FSIA's three commercial activity exceptions that deprive a foreign sovereign of its immunity from suit. The district court disagreed, holding it lacked jurisdiction because BP's action fit neither exception. We review the district court's decision de novo. Gen. Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1380 (8th Cir. 1993).

Our review concentrates upon the first commercial activity exception, which vitiates a foreign sovereign's immunity in an action "based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). This plain statutory language naturally lends itself to analysis in two parts. To rebut a foreign sovereign's presumption of immunity, a plaintiff's action must be (1) based upon (2) a commercial activity carried on in the United States. See id. BP contends its action meets both elements of this exception and thereby eliminates Sopo's presumptive immunity, a contention we shall explore in detail below.

A

The FSIA contains no definition of "based upon," so we must accord that phrase its plain and ordinary meaning in interpreting the statute. Nelson, 507 U.S. at 357. "[A] claim is 'based upon' events in the United States if those events establish a legal element of the claim. . . . An action is based upon the elements that prove the claim, no more and no less. If one of those elements consists of commercial activity within the United States or other conduct specified in the Act, this country's courts have jurisdiction." Santos v. Compagnie Nationale Air France, 934 F.2d 890, 893 (7th Cir. 1991) (cited approvingly on this point in Nelson, *supra*). We emphasize that only one element of a plaintiff's claim must concern commercial activity carried on in the United States. "The entire case need not be based on the commercial activity of the defendant." Sun v. Taiwan, 201 F.3d 1105, 1109 (9th Cir. 2000).

Because our task is to discern whether any of BP's claims (or any elements of those claims) are based upon commercial activity carried on in the United States, we turn our attention first to BP's amended complaint. The amended complaint includes a formidable array of claims with roots in state law, federal law, and international law. We need not consider each of these claims separately, since only one claim or element of a claim need concern commercial activity in the United States to erode Sopo's presumptive immunity. Following BP's lead, we train our focus upon its state

-6-

law claims that Sopo misappropriated BP trade secrets. In particular, according to Count III of the amended complaint, Sopo violated the Missouri Uniform Trade Secrets Act (MUTSA) by improperly disclosing BP's trade secrets to numerous American vendors without BP's express or implied consent, while Sopo knew or should have known the trade secrets were stolen or were derived from a person owing a duty to maintain their secrecy. JA 400-402.

The Missouri legislature adopted the MUTSA in 1995. The MUTSA—like nearly every set of state trade secret laws—derives from the Uniform Trade Secrets Act, first promulgated by the National Conference of Commissioners on Uniform State Laws in 1979. The Uniform Act provides that misappropriation of trade secrets may occur in any of three forms: improper acquisition, disclosure, or use. Its Prefatory Note explains that liability for misappropriation exists when "either a person's acquisition of the trade secret, disclosure of the trade secret to others, or use of the trade secret [is] improper." 14 Uniform Laws Annotated 434 (West 1990).

The MUTSA generally follows the Uniform Act by acknowledging these alternative forms of misappropriation, though the MUTSA lumps improper disclosure and use into a single category. Thus, the MUTSA defines misappropriation to take two forms:

(a)  Acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(b)  Disclosure or use of a trade secret of a person without express or implied consent by another person who:
   a. Used improper means to acquire knowledge of the trade secret; or
   b. Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

-7-

c. At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

    i.   Derived from or through a person who had utilized improper means to acquire it;

    ii.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    iii. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Mo. Stat. § 417.453(2). A recent decision from a district court within our circuit cogently explains the two forms of misappropriation recognized by the MUTSA.

> The first is when one acquires a trade secret through "improper means," that is, through such means as theft, bribery or inducing one to breach a duty of secrecy. Id. § 417.453(2)(a) . . . . The second example of misappropriation occurs when one disclosing a trade secret without consent, *inter alia*, knew or had reason to know that the secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Id. § 417.453(2)(b)c.(ii).

H & R Block E. Tax Servs., Inc. v. Enchura, 122 F. Supp. 2d 1067, 1074 (W.D. Mo. 2000). Applying similar state law, we have previously recognized these alternate means of proving misappropriation, Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 833 (8th Cir. 1996) (defining misappropriation of trade secrets under Minnesota law as either "(1) improper acquisition of a trade secret; or (2) disclosure or use of a trade secret without consent"), as have other circuits, e.g., Sokol Crystal Prods., Inc. v. DSC Communications Corp., 15 F.3d 1427, 1429 (7th Cir. 1994) (same); accord DTM Research, L.L.C. v. AT&T Corp., 245 F.3d 327, 332 (4th Cir. 2001); Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 750 (2d Cir. 1998).

BP has elected to pursue a misappropriation claim against Sopo stemming from Sopo's purported wrongful *disclosure* of BP trade secrets to American engineering

firms. BP might have chosen to pursue theft-type claims against Sopo, but BP elected not to do so and that strategic, legal choice is well within BP's discretion as the master of its complaint. It may be true that many misappropriation claims arise when one party steals another's trade secret. Such theft is often followed by disclosure, as the thief attempts to cash in on his ill-gotten gains. In that case, we believe the MUTSA permits a trade secret holder to pursue both theft and disclosure claims for misappropriation. One type of claim does not preclude the other. Our review of trade secret law confirms that the MUTSA is hardly novel in this respect: a plaintiff may premise his misappropriation claim on any or all of these alternate forms of improper conduct.

We believe BP's disclosure-type MUTSA claim is "based upon" Sopo's commercial activity carried on in the United States. The claim requires BP to prove Sopo disclosed BP's trade secrets to others without consent, while having reason to know the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy. See Mo. Stat. § 417.453(2)(b)(c). In the course of proving that claim, BP says it will demonstrate Sopo disclosed BP's trade secrets to American vendors in the United States while procuring equipment to fabricate the 921 plant. BP's MUTSA claim satisfies the required nexus with the United States because the claim is linked to Sopo's procurement activities in the United States. Therefore, we have little difficulty concluding that an element of BP's claim is based upon events transpiring in the United States—Sopo's disclosures to American vendors.

Both Sopo and the district court disagree with our line of reasoning, but for slightly different reasons. Sopo contends BP's reliance on *disclosure* to American vendors is immaterial to BP's misappropriation claim and that BP's claim actually turns on whether Sopo's *acquisition* of BP trade secrets was tortious. Appellee's Brief 20. (Sopo urges this distinction because it claims BP's trade secrets were stolen outside the United States, hence BP's action would not concern commercial activities in the United States.) Sopo appears to argue that the MUTSA does not provide a

misappropriation cause of action based entirely upon improper disclosure, but rather requires every trade secret plaintiff to prove the defendant stole its proprietary information—a contention we have rejected in the preceding discussion. We believe the MUTSA provides for misappropriation claims based upon wrongful disclosure of trade secrets, and we conclude Sopo's disclosure of trade secrets lies at the very heart of BP's action.

Unlike Sopo, the district court acknowledged BP could ground a misappropriation claim upon Sopo's wrongful disclosures in the United States. But the district court believed BP's reliance on a disclosure theory was merely a "semantic ploy" because BP's true claim was captured by a theft theory. "At its core, this lawsuit concerns Sopo's acquisition of BP's technology in an unknown place and Sopo's commercial exploitation of that technology in China." BP Chems., 144 F. Supp. 2d at 1144. The district court effectively recast BP's misappropriation claim under the rubric of theft, rather than wrongful disclosure. And because Sopo's alleged theft likely occurred outside the United States, the district court held BP's misappropriation claim was not "based upon" commercial activity occurring in the United States.

The district court's reference to a semantic ploy derives from Nelson, in which the Court rejected a plaintiff's artful attempt to refashion an intentional tort claim as a negligent failure to warn claim. 507 U.S. at 363 ("For aught we can see, a plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn, simply by charging the defendant with an obligation to announce its own tortious propensity before indulging it."). Nelson refused to consider the failure to warn claim as a proper basis for proving a foreign sovereign's contacts with the United States.

Nelson's "semantic ploy" discussion requires delicate handling. One might read the Court's discussion as extending to a district judge broad discretion to recast

-10-

a plaintiff's claims to fit the judge's understanding of the case. Yet we can scarcely imagine the Court intended that result. Such an expansion of judicial power is at loggerheads with liberal notice pleading rules and our settled understanding that a plaintiff is the master of his complaint. The repercussions of this interpretation of the "semantic ploy" discussion are simply too severe for us to accept it as the Court's intended meaning.

Rather, it appears the Court fixed its sights on a slightly different target—the legal merits of the underlying claim. The Court's discussion suggests a plaintiff may not premise the absence of sovereign immunity upon a legally invalid claim. Some of the dissenters in Nelson, who attacked the semantic ploy discussion with gusto, apparently understood the Court's discussion in these terms. 507 U.S. at 373 (Kennedy, J., dissenting) ("The Court's summary treatment may stem from doubts about the underlying validity of the negligence cause of action."). Nelson described the absurdity of the plaintiff's claim that a foreign sovereign bore him a duty to warn of its indulgence in intentionally tortious conduct. The absurdity of Nelson's claim had a legal (not factual) dimension for there is generally no claim of negligence that flows from intentionally tortious conduct. See Restatement (Second) of Torts § 282 cmt. d (1965); see also United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 353 (2d Cir. 1993) (recognizing the "mutual exclusivity of negligence and battery"); Hockensmith v. Brown, 929 S.W.2d 840, 845 (Mo. Ct. App. 1996) ("The theories of negligence and intentional tort are contradictory and mutually exclusive."). As a matter of law, Nelson's failure to warn claim was apparently invalid because it rested upon the sovereign's performance of intentionally tortious acts. Thus, we glean from Nelson the principle that a plaintiff may not undo a foreign sovereign's immunity simply by pleading a legally untenable claim whose elements would happen to demonstrate the sovereign's contacts with the United States.

Interpreted in this fashion, Nelson's semantic ploy doctrine does no violence to our settled expectations. In fact, the approach finds a home in the Court's ongoing

oversight of federal court jurisdiction. We perceive an implicit analogy between this aspect of <u>Nelson</u> and the venerable doctrine that a plaintiff may not defeat a defendant's right of removal based upon diversity of citizenship jurisdiction by fraudulently joining a non-diverse defendant. <u>See</u> <u>Wilson v. Republic Iron & Steel Co.</u>, 257 U.S. 92, 97-99 (1921). We recently explained that "[j]oinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law supporting a claim against the resident defendants." <u>Wiles v. Capitol Indem. Corp.</u>, 280 F.3d 868, 871 (8th Cir. 2002). Thus, fraudulent joinder forbids a plaintiff from *avoiding* a federal court by raising a claim devoid of legal merit; the semantic ploy doctrine forbids a plaintiff from *remaining* in a federal court by asserting a dubious legal claim. The doctrines occupy opposite poles of the jurisdictional globe. Both protect the integrity of our jurisdiction by ensuring it is neither expanded nor retracted by sham pleadings.

It is obvious that <u>Nelson</u>'s semantic ploy doctrine has no application in this case. The failure to warn claim in <u>Nelson</u> was a facially-invalid tort and was therefore dissimilar to BP's wrongful disclosure misappropriation claim rooted in the precise words of a Missouri statute. BP has elected to pursue a misappropriation claim under a disclosure theory and we believe that course of action is BP's legal and strategic prerogative. For this reason, BP's misappropriation claim does not compare to Nelson's legally invalid failure to warn claim. The district court failed to heed the importance of BP's choice of misappropriation theory and improperly invoked the specter of <u>Nelson</u>'s semantic ploy doctrine. Contrary to the district court's holding, BP's action is indeed "based upon" commercial transactions that occurred within the United States.

B

BP has satisfied the first element of the commercial transaction exception we identified above, so we turn to the second element—"a commercial activity carried

-12-

on in the United States." The FSIA defines this phrase to mean "commercial activity carried on by [a foreign] state and having substantial contact with the United States." 28 U.S.C. § 1603(e). This definition has two parts. First, there must be *commercial activity*, which the FSIA further defines as "either a regular course of commercial conduct or a particular commercial transaction or act." Id. § 1603(d). Second, that commercial activity must have *substantial contact* with the United States. We believe Sopo's alleged contacts with American vendors satisfy both parts of this definition.

1

Sopo does not seriously question the commercial character of its alleged acts, and wisely so. Sopo's attempts (through its agent SPECO) to contact American vendors to produce goods needed to build the 921 plant were obviously "commercial" in character. Prior cases suggest that a foreign state's contract to buy equipment from an American manufacturer constitutes a "commercial activity" within the meaning of the statutory exception. E.g., McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 349 (8th Cir. 1985); accord Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines, 965 F.2d 1375, 1384-85 (5th Cir. 1992) (collecting cases and opining that contracts for the procurement of goods and services typically satisfy the commercial activity requirement in the FSIA); Restatement (Third) of the Foreign Relations Law of the United States § 453 cmt. b (1987) ("An activity is deemed commercial . . . if it is concerned with production, sale, or purchase of goods . . . ."). These authorities readily confirm that Sopo's recruitment of American vendors to manufacture products for its 921 plant was "commercial activity."

2

We likewise believe Sopo's efforts to obtain the fruits of American engineering know-how constitute "substantial contact" with the United States.

At the margins, defining the term "substantial contact" has proven difficult. The District of Columbia Circuit has suggested that proof of substantial contact requires more than the minimum contacts sufficient to satisfy due process in establishing personal jurisdiction. Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1109 n.23 (D.C. Cir. 1983). Perhaps for this reason, courts have been reluctant to declare single visits to the United States by representatives of foreign sovereigns to constitute substantial contact. E.g., Soudavar v. Islamic Republic of Iran, 186 F.3d 671, 674 (5th Cir. 1999), cert. denied, 528 U.S. 1157 (2000). Even two visits have not always been deemed substantial contact. Maritime Int'l Nominees, 693 F.2d at 1109.

We are not faced with a single- or double-visit case, however, nor must we resolve a case of comparable difficulty. Contacts much more significant than isolated visits should, we believe, satisfy the FSIA's requirement. For example, "[s]olicitation of business within the United States is generally a sufficient nexus" to meet the substantial contacts test. 15 Moore's Federal Practice ¶ 104.12[2][c][ii] (Matthew Bender 3d ed. 2001); see also In re Papandreou, 139 F.3d 247, 253 (D.C. Cir. 1998) ("[O]ur cases do not foreclose the possibility that some degree of solicitation in the U.S. might satisfy the 'substantial contact' requirement.").

In this case, BP alleges Sopo (through its agent, SPECO) solicited business from vendors in the United States on an ongoing basis. A foreign state can surrender its immunity by virtue of activities committed by its agent, Maritime Int'l Nominees, 693 F.2d at 1105-1107, but Sopo contends this principle does not apply here because SPECO was not its agent. And because BP's proof of substantial contact rests entirely upon the agency allegations, Sopo contends BP cannot meet the substantial contact requirement. Sopo therefore posits SPECO's American contacts cannot be used to hale it into federal court.

BP's amended complaint pleads an agency between Sopo and SPECO. According to that complaint, SPECO procured essential materials from American vendors on Sopo's behalf. Without these materials, BP contends, Sopo could not have copied BP's trade secret designs and constructed an acetic acid plant in China. It may fairly be inferred from BP's amended complaint that SPECO's contacts with American firms were regular and sizeable in number. We therefore believe BP's allegations amply support Sopo's substantial contact with the United States.

Sopo acknowledges, as it must, that BP's amended complaint plainly alleges SPECO operated as its American purchasing agent. But Sopo contends BP has not pleaded this agency relationship with particularity, as is required by federal law. We find little support for Sopo's contention that allegations of agency are subject to heightened pleading standards. Federal Rule of Civil Procedure 9(b) requires allegations of "fraud or mistake" to be pleaded with particularity, but allegations of agency are not mentioned in the text of this Rule. In our view, the Rule's silence is meaningful, for the Supreme Court recently refused an invitation to extend Rule 9(b)'s heightened pleading standard beyond the two categories enumerated in the Rule. Swierkiewicz v. Sorema N.A., 122 S. Ct. 992, 998-99 (2002).

We are cognizant of cases requiring plaintiffs to allege the existence of an agency with particularity, but the heightened pleading requirement in these cases stems from the connection between the agency and allegations of fraud. "[W]hen the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship of a defendant, the reasons for more particularized pleading that animate Rule 9(b) apply with equal force to the issue of agency and to the underlying fraud claim." Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 783 (7th Cir. 1999); cf. Abels v. Farmers Commodities Corp., 259 F.3d 910, 916 (8th Cir. 2001) (assuming, without deciding, that "a plaintiff seeking to hold a principal liable for an agent's fraud must plead not only fraud but also agency with particularity"). These cases are of no value in resolving the present dispute because BP has not

alleged fraud in its amended complaint. Even under the rationale propounded in the cases cited above, BP would not have been obliged to plead the Sopo-SPECO agency relationship with particularity in its amended complaint.

BP's amended complaint is replete with allegations that SPECO acted as Sopo's agent. These allegations suffice—at least in the infancy of this litigation—to bring SPECO's conduct into play in analyzing whether Sopo had "substantial contact with the United States." We believe Sopo's contacts were indeed substantial.

We therefore hold Sopo is not immune from BP's suit in federal court because the suit is based upon Sopo's commercial activity carried on in the United States. See id. § 1605(a)(2). Because Sopo lacks sovereign immunity, the district court had subject matter jurisdiction and erred in dismissing the action.

C

Sopo devotes much of its brief to alternative grounds for affirmance that the district court declined to address. Sopo argues the district court lacks personal jurisdiction over it; Sopo also argues the doctrine of *forum non conveniens* precludes BP's suit in federal court when the essential controversy arose in China.

The force of these arguments depends entirely upon the facts of the case, facts that have not yet been established by the district court. For example, proper resolution of the *forum non conveniens* argument will depend heavily upon whether BP could receive a fair hearing in the Chinese courts. Both BP and Sopo offered expert witnesses in the district court to testify about the relative quality and independence of the Chinese judiciary. Not surprisingly, these experts' accounts differed. We believe it would be imprudent to address Sopo's alternative arguments bereft of the considered views and factual findings of the district court. We therefore

-16-

decline to consider these arguments at this juncture; in so ruling, we wish to make explicit that Sopo may renew these arguments at an appropriate time.

## IV

We reverse the judgment of the district court and remand for appropriate further proceedings. BP's additional arguments that the district court should have permitted it to file a second amended complaint and to take further jurisdictional discovery are mooted by our disposition.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.