# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1814

_____

BP Chemicals Ltd.,                  *
an English Corporation,             *
                                    *
        Plaintiff-Appellee,         *
                                    *   Appeal from the United States
    v.                              *   District Court for the
                                    *   Eastern District of Missouri.
Jiangsu SOPO Corporation            *
(Group) Ltd.,                       *
                                    *
        Defendant-Appellant.        *

_____

Submitted: January 10, 2005
Filed: August 25, 2005

_____

Before WOLLMAN, FAGG, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

This case, in which BP Chemicals (BP) alleges Jiangsu SOPO Corporation misappropriated its trade secrets, is before us a second time. In the first appeal, we held BP's pleadings survived a facial jurisdictional challenge brought by SOPO pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611 & 1330. BP Chems., Ltd. v. Jiangsu SOPO Corp. (Group), 285 F.3d 677, 688 (8th Cir. 2002). In this appeal, we must determine whether BP marshaled sufficient facts in support of its pleadings to survive SOPO's factual jurisdictional challenge under the FSIA, and whether SOPO had sufficient contacts with the State of Missouri for

the district court[1] to exercise personal jurisdiction over it. We affirm the district court's denial of SOPO's motion to dismiss on both counts.

I

The factual background is important to our resolution of the issues before us, and more developed than it was when we first heard this case; we therefore delve into it in some detail, and caution the reader we may repeat facts set forth in our first opinion which we deem necessary to understand the background upon which this decision is to be decided.

This case involves the alleged misappropriation of trade secrets for a process used to manufacture acetic acid, a chemical component used in inks, plastics, resins, and fabrics. The process is known as the methanol carbonylation process, and was developed by Monsanto in the 1960s and 1970s. BP bought the process from Monsanto in 1986. Like Monsanto had done, BP licensed the process to third parties. For example, in the 1990s, BP licensed four acetic acid plants in Asia, including two in China. One of the Chinese plants was the Shanghai-Wujing Chemical plant, which acquired a license from BP in 1993. When BP bought the methanol carbonylation process from Monsanto, it also stepped into Monsanto's shoes with respect to existing license agreements Monsanto had with third parties. One of those licenses had been granted to a Taiwanese company known as China Petrochemical Development Corporation (CPDC).

In 1988, a business enterprise called the Shanghai Petrochemical Engineering Company (SPECO) was formed to engage in major chemical engineering projects in China. In 1990, the People's Republic of China (China) approved the building of a

---

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

major acetic acid factory in Zhenjiang City. This project became known as the 921 project (the "92" signifying the year 1992, and the "1" signifying the month of January). In 1992, SOPO, a chemical company organized under the laws of China and wholly-owned by the Chinese government, contracted with SPECO for the latter to design and construct the 921 plant for SOPO as the ultimate end user and owner. SPECO thereafter contracted with a number of vendors in the United States to fabricate the specialized equipment needed for a methanol carbonylation acetic acid plant, supposedly utilizing "home-grown" technology, that is, technology developed by a Chinese chemical research institute for a low-pressure methanol carbonylation process.

The group of vendors who specialize in fabricating equipment needed for a methanol carbonylation acetic acid plant is relatively small. Monsanto and BP (and their licensees) had used these same vendors for all of their licensed plants worldwide. Thus, the vendors were familiar with the specifications they would regularly receive utilizing BP's trade secrets for its methanol carbonylation process.

At some point in 1995, BP learned some of the specialized vendors had received bid specification packages from SPECO for SOPO's 921 plant that were very similar to specifications used by Monsanto and BP in prior licensed projects, in particular the Shanghai-Wujing project and the CPDC project. In fact, the record now shows certain specifications for the 921 project were shameless copies of either CPDC or Shanghai-Wujing specs, in some cases replicating typographical errors made in the specs used on those projects. Appellee's App. at 1708-23.

In February 1999, BP filed this action in Missouri district court against SOPO, SPECO, and Nooter Corporation. Nooter was one of the American vendors, located in St. Louis, Missouri, who supplied the SOPO plant with nineteen key pieces of

equipment consisting of: a drying column[2]; two reactors, one main reactor and one promoter reactor; five reboilers; four condensors; two coolers; one heater[3]; and zirconium and hastelloy material on three columns and one separator.

BP alleged, among other things, the parties misappropriated BP's trade secrets in violation of the Missouri Uniform Trade Secrets Act (MUTSA), Mo. Ann. Stat. §§ 417.450 through 417.467. BP obtained a default judgment of $16 million against SPECO, which is now defunct. Nooter eventually settled with BP for an undisclosed sum, and the terms of the settlement, in part, require Nooter to cooperate with BP in its action against SOPO. BP initially had trouble obtaining service against SOPO under the Hague Convention, but SOPO eventually appeared voluntarily in the action under the threat of a default judgment being entered against it.

SOPO brought a motion to dismiss the action for lack of subject matter jurisdiction alleging immunity from suit under the FSIA. SOPO contended the pleadings were insufficient on their face to fall within the "commercial activity carried on in the United States" exception to immunity under the FSIA. 28 U.S.C. § 1605(a)(2). The district court agreed and granted the motion, holding BP's suit against SOPO focused on the wrongful acquisition of BP's trade secrets, and SOPO did not acquire any of BP's trade secrets in the United States.

---

[2]Most of the "shameless copy" exhibits presented by BP relate to specifications on drying columns. Three relate to a "hastelloy B-2 reactor." Appellee's App. at 1717, 1721-22. Two relate to "pump specifications." Id. at 1712-13. One relates to "sheet, plate, and strip" specifications. Id. at 1714. One relates to "piping" specifications. Id. at 1715. One relates to "material" specifications in general. Id. at 1716. One relates to a "light ends column." Id. at 1720.

[3]The reboilers, condensors, coolers and heater are collectively referred to as "heat exchangers" in some documents in the record.

BP appealed. On appeal, we held BP's theory was based on more than just the wrongful acquisition of the trade secrets. BP also claimed SOPO "used" or "disclosed" the trade secrets in meetings with the American vendors which occurred in the United States, acting through its alleged agent, SPECO. See BP Chems., 285 F.3d at 683 (explaining these alternate forms of misappropriation under the MUTSA). Taking as true BP's allegation that SPECO was SOPO's agent, we held the allegations regarding SPECO's activities within the United States were sufficient to fall within the FSIA's commercial activity exception, and remanded the case to the district court for further proceedings. Id. at 687-88.

Back in the district court, with the benefit of additional discovery, BP realized it might not be able to muster sufficient facts to show SPECO acted as SOPO's agent when it met with American vendors. Significantly, discovery revealed the contracts between SOPO and SPECO left the design and construction of the 921 plant, including the selection of vendors and equipment, totally in the hands of SPECO without any control exercised by SOPO. BP then amended its complaint to add allegations of a civil conspiracy between SOPO and SPECO.

SOPO again moved to dismiss, this time raising a factual challenge to subject matter jurisdiction under the FSIA. SOPO contended the facts failed to show SPECO was its agent. SOPO also argued it had not conducted sufficient commercial activity within the United States on its own to fall within the commercial activity exception to FSIA immunity. SOPO also challenged the personal jurisdiction of the district court, arguing it did not have sufficient minimum contacts with the forum of Missouri to expect to be haled into court there.[4]

_____

[4]SOPO also moved to dismiss on grounds of *forum non conveniens*, arguing the proper forum should be the courts of China. The district court's denial of that motion is not at issue in this appeal.

BP opposed the motion. With respect to the FSIA claims, BP argued SPECO was SOPO's agent, and thus SPECO's contacts with American vendors could be imputed to SOPO; SPECO and SOPO were co-conspirators; and SOPO's own activity in the United States was sufficient to show SOPO "used" or "disclosed" BP trade secrets. BP also opposed the motions to dismiss based on lack of personal jurisdiction.

After holding an evidentiary hearing, the district court found the facts presented by BP were insufficient to establish SPECO acted as SOPO's agent when it dealt with American vendors. The district court also rejected BP's conspiracy theory. The district court agreed with BP, however, that SOPO's own activity within the United States was sufficient for jurisdiction under the FSIA. The district court focused on a number of vendor meetings in which SOPO representatives directly participated. These vendors meetings can be broken into two main categories – the Nooter meetings, and the meetings with all other vendors.

## A.    The Nooter Meetings in Missouri

### 1) The Spring 1994 Meetings

The district court found "[i]n February or March of 1994, the President of SOPO, Mr. Song, was the Deputy Head of a delegation that visited Nooter. During this meeting, which lasted two days, preliminary technical issues were discussed, including sizing and thickness of the equipment that was specified on detailed documents previously provided to Nooter for the project." Addendum at 11-12. The record shows a second SOPO representative was also present during the Spring 1994 meeting, Mr. Lang, who is listed as the "Deputy Chief Engineer" of the 921 plant. Appellee's App. at 3083.

**2) The June 1995 Inspection Visit**

The district court found "[i]n June of 1995 SOPO's Vice Director [Mr. Zhao] visited Nooter to inspect the equipment being built for the project, and the SOPO representative participated in testing the equipment." Id. at 12.

**3) The August 1995 Inspection Visit**

The district court found "[i]n August of 1995 another Chinese delegation, again including SOPO's Vice Director, as well as engineers from SPECO and PRC government agencies, visited Nooter for more equipment inspection." Id.

With respect to all three visits to Nooter by SOPO representatives, the district court generally found "[t]he discussions at the meetings related to equipment being built by the vendors using the allegedly stolen trade secrets. Since the discussions concerned equipment being built from stolen specifications, BP's trade secrets were 'used' during these meetings." Id. at 21. The district court, however, did not identify the specific equipment inspected, or which specific BP trade secrets were incorporated into that equipment, during the Nooter visits.

**B.    The Other Vendor Meetings**

The district court also discussed ten other meetings where one or more SOPO representatives visited various vendors in the United States. Below follows a summary of the district court's findings with respect to each visit:

### 1) Measurement, Inc., Chino, California

In May of 1996, four SOPO representatives visited Measurement for a factory acceptance test, during which over thirty detailed tests were run on process analyzer equipment.

### 2) Fisher-Rosemount, Burnsville, Minnesota

In the summer of 1995, one SOPO representative was part of a contingent of engineers who visited the Fisher-Rosemount plant for two full weeks of testing and training on a computerized control system built for the 921 plant.

### 3) BW/IP plant, Tulsa, Oklahoma

In September of 1995, one SOPO engineer visited this facility to inspect equipment being built for the 921 plant.

### 4) Phoenix Co., Houston, Texas

In the summer of 1996, one SOPO engineer was part of a delegation that visited this facility to inspect zirconium pipe and fittings.

### 5) Haynes International, Kokomo, Indiana

On two different occasions – one in 1995 and another in late 1996 or early 1997 – a SOPO representative accompanied a delegation of several SPECO employees to this company's facilities for "source inspections" of material.

### 6) Hobart Corp., Troy, Ohio

In May of 1995, two SOPO welders, along with others, obtained training on welding hastelloy materials at this company's facilities.

### 7) Lightnin, Rochester, New York

In August of 1995, a SOPO engineer went to this company's facilities to inspect the motors and spare parts being built for the 921 project.

### 8 ) Baird Co.

In July of 1995, three SOPO employees were part of a delegation that visited this company "in connection with the 921 project."

### 9) A Company Near Boston, Massachusetts

SOPO admitted sending at least one of its representatives to "a company near Boston" in September of 1995 to "check adjustment of valves."

### 10) ABB Co.,Ohio

In August of 1996, two SOPO employees traveled to Ohio with a SPECO delegation "for training on vendor equipment."

As noted above, the district court entered a general finding with respect to all these vendor visits (including the Nooter visits) finding:

> At least twenty employees of SOPO traveled to at least eleven vendors between 1994 and 1996. During these meetings, among other things,

> SOPO employees inspected and tested equipment for the 921 Plant and trained for its ultimate use. SOPO's personnel on numerous occasions participated in technical discussions regarding the construction of the plant and the equipment being ordered from the U.S. vendors. The discussions at the meetings related to equipment being built by the vendors using the allegedly stolen trade secrets. Since the discussion concerned equipment being built from stolen specifications, BP's trade secrets were "used" during these meetings.

Id.

With respect to SOPO's "sufficient contacts" personal jurisdiction challenge, the district court focused on this same commercial activity, in particular the Nooter meetings which occurred in Missouri, and concluded SOPO had sufficient minimum contacts with Missouri for the court to exercise personal jurisdiction over SOPO.

SOPO filed a timely appeal asserting its immunity from suit under the FSIA, and asserting the district court lacked personal jurisdiction over it.

II

## A.    Immunity under the FSIA

Because SOPO is an entity wholly-owned by China, it is considered a "foreign state" under the FSIA, and is presumptively immune from suit in American courts. A claim can be brought against a foreign sovereign, however, if the action is "based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). BP has the burden to prove an exception applies. See Gen. Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1382 (8th Cir. 1993) ("Once a foreign state makes a prima facie showing of immunity, the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies."). Significantly, however, only one element of BP's trade secrets claim must concern commercial activity conducted

in the United States; BP need not show that each element of its claim is connected to commercial activity in the United States. BP Chems., 285 F.3d at 682 (citing Sun v. Taiwan, 201 F.3d 1105, 1109 (9th Cir. 2000)).

The relevant claim for purposes of this appeal is BP's claim SOPO improperly "used" its trade secrets. Under the MUTSA, BP's claim consists of the following elements: 1) SOPO used BP's trade secrets without BP's express or implied consent; and 2) at the time of the use, SOPO knew or had reason to know that knowledge of the trade secret was derived from or through a person (SPECO) who had utilized improper means to acquire it. Mo. Stat. Ann. § 417.453(2)(b). BP contends the evidence considered by the district court demonstrates SOPO used BP's trade secrets without BP's consent, and the use is connected to SOPO's own commercial activity in the United States.

SOPO counters that BP's evidence and the district court's fact findings are not specific enough to survive its factual challenge to jurisdiction. SOPO claims proof that its representatives were present during the various vendor meetings, and that equipment for the 921 plant was discussed during those meetings, is insufficient to show that SOPO itself used BP trade secrets during the meetings. Citing Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 891 F. Supp. 1345, 1349 (E.D. Mo. 1995), and Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983), SOPO argues it was incumbent upon the district court to identify which specific trade secrets SOPO used during the meetings. Reviewing the district court's findings of disputed jurisdictional facts for clear error, Hunter v. Underwood, 362 F.3d 468, 477 (8th Cir. 2004), and the district court's ultimate determination regarding immunity under the FSIA *de novo*, BP Chems., 285 F.3d at 682, we disagree.

Young Dental and Electro-Craft are distinguishable from this case, and do not support the proposition that the district court's fact findings lack specificity. Young

Dental dealt with the alleged infringement of a patent on a dental device called a disposable prophy angle (DPA), brought by a dental manufacturing company against a former employee. The district court granted summary judgment in part because "[t]he complaint fails to identify with any particularity the nature of the trade secrets and confidential information allegedly taken and used by the defendants." 891 F. Supp. at 1349. The court noted "Dental Young's President, G. Richmond, could not identify a single trade secret or piece of confidential information that he was aware of that defendant Carron had taken or used." Id. Here, in contrast, BP's complaint identifies with particularity the nature of the trade secrets and confidential information allegedly used and taken by SPECO and SOPO. The Second Amended Complaint contains a four-page description of the trade secrets, divided into Process Information, Equipment Specifications, Materials of Construction, and Engineering Drawings. Appellee's App. at 71-74. Furthermore, BP's evidence specifically identifies multiple instances in which its engineering drawings were copied and used by SPECO and SOPO. Id. at 1708-23.

Electro-Craft stands for nothing more than the general proposition "[w]ithout a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful." 332 N.W.2d at 897. Here, BP clearly identified page after page of proprietary information which was copied for use in the 921 plant.

SOPO also cites several cases for the proposition that it was incumbent upon the district court to identify the specific conduct of SOPO representatives during the vendor meetings to show they used BP's trade secrets. See Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 831 (8th Cir. 1996) (affirming JAML because there was no direct evidence the defendant actually used its confidential information with a third party); Pere v. Nuovo Pignone, Inc., 150 F.3d 477, 482 (5th Cir. 1998) (reversing denial of motion to dismiss based on FSIA immunity where, although foreign sovereign sent consultants to United States in connection with final assembly of product, there was no direct evidence the consultation addressed an integral part

-12-

of the product's design or manufacture); <u>Sanchez v. Banco Central De Nicaragua</u>, 770 F.2d 1385, 1391 (5th Cir. 1985) (holding plaintiff must "define with precision the relevant commercial activity" to establish FSIA's commercial activity exception, which "requires focusing on the acts of the named defendant, not on other acts that may have had a causal connection with the suit."); <u>Nat'l Rejectors, Inc. v. Trieman</u>, 409 S.W.2d 1, 33 (Mo. 1996) (finding no direct evidence that drawings for a particular part were used by defendants and refusing to "speculate just which drawing" may have been used).

We believe these cases are all factually distinguishable from the present case. The district court identified the specific acts of SOPO which it determined constituted commercial activity in the United States, that is, SOPO's direct participation in vendor meetings during which equipment utilizing trade secrets stolen from BP was discussed, inspected and tested. The record shows specific and direct evidence of SPECO providing engineering drawings and other protected information for the specifications on the equipment discussed during the vendor meetings. And while the district court did not identify the specific equipment discussed at each vendor meeting, it is reasonable to infer, at least with respect to the two-day meeting at Nooter, that *all* the equipment provided by Nooter was discussed. The record demonstrates the high level of formality required by the Chinese government for the acceptance of the equipment. Indeed, this high level of formality appears to be the primary reason SOPO representatives, rather than just SPECO representatives, were required to attend the vendor meetings in the United States before approving the equipment. It would be odd, indeed, if the Chinese government required SOPO to attend these meetings and inspections, and then not require them to inspect all the equipment.

In sum, the district court found BP trade secrets were used and discussed during multiple vendor meetings in the United States. The district court found at least twenty SOPO representatives attended these meetings, actively participating in

-13-

technical discussions, and inspections and tests of the equipment. These findings are not clearly erroneous, and are sufficient to show commercial activity by SOPO in the United States connected to SOPO's use of BP trade secrets.[5]

## B. Personal Jurisdiction

SOPO also challenges the district court's denial of its motion to dismiss for lack of personal jurisdiction. Although the denial of a motion to dismiss for lack of personal jurisdiction is generally not immediately appealable, United States v. Brakke, 813 F.2d 912, 913 (8th Cir. 1987), personal jurisdiction is "inextricably intertwined" with FSIA immunity and thus can be raised in an appeal addressing that issue. S & Davis Int'l, Inc. v. The Republic of Yemen, 218 F.3d 1292, 1297 (11th Cir. 2000).

We dispose of this issue in quick fashion. The district court found SOPO had sufficient contacts with the United States to fit within the commercial activity exception of the FSIA. We believe this is dispositive of the related issue whether SOPO had sufficient minimum contacts with an American forum that it could be expected to be haled into court there. See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89-90 (D.C. Cir. 2002) (collecting cases which hold the

---

[5]SOPO further claims the evidence is insufficient to show SOPO had actual or constructive knowledge that BP's trade secrets were derived from or through a person who had utilized improper means to acquire it. That, however, is a separate element of BP's claim, see Mo. Stat. Ann. § 417.453(2)(b), and as noted above, at this stage of the litigation BP need only show that one element of its claim is connected to commercial activity in the United States. Thus, we need not, and do not, address the issue of SOPO's knowledge at this time.

"exercise of personal jurisdiction over foreign states under the [FSIA]" also satisfies the "minimum contacts" requirements of the Due Process Clause).[6]

III

We affirm the order denying SOPO's motion to dismiss, and remand this case to the district court for further proceedings.

_____

[6]Indeed, the nexus requirements imposed by the FSIA probably exceed the constitutional standard.  See In re Papandreou, 139 F.3d 247, 253 (D.C. Cir. 1998) (holding "substantial contact" required by 28 U.S.C. § 1603(e), which defines "commercial activity," requires more than the "minimum contacts" necessary to satisfy due process requirements).