**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ORIENT MINERAL COMPANY, a
Nevada corporation; WIL-BAO
MINERAL CO., a limited liability
company formed under the laws of the
People's Republic of China,

      Plaintiffs-Appellants,
      Cross-Appellees,

v.

BANK OF CHINA, a foreign banking
institution doing business in the
United States,

      Defendant-Appellee,
      Cross-Appellant.

Nos. 05-4037, 05-4048, 05-4220

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:98-CV-238-BSJ)**

---

Robert W. Ludwig, Jr., Ludwig & Robinson, P.L.L.C., Washington, D.C. (Allan
O. Walsh, McKay, Burton & Thurman, Salt Lake City, Utah, with him on the
briefs) for Plaintiff-Appellants - Cross-Appellees Orient Mineral Company and
Wil-Bao Mineral Company.

Christopher Brady, Butzel Long, a Professional Corporation, New York, New
York (Orlee Goldfeld, Butzel Long, a Professional Corporation, New York, New
York, and Arthur B. Berger, Ray Quinney & Nebeker, Salt Lake City, Utah, with
him on the briefs) for Defendant-Appellee - Cross-Appellant Bank of China.

Before **KELLY** and **EBEL**, Circuit Judges, and **MURGUIA,**[*] District Judge.

**EBEL**, Circuit Judge.

These appeals require this court to determine, among other things, the extent to which investors in Chinese gold mines can sue the Bank of China (the "Bank") in an American court. Because the Bank was owned and operated by the People's Republic of China, an American court's subject matter jurisdiction must be found under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-11. The FSIA provides that a foreign sovereign is generally immune from suit in the United States. See id. §1604. The FSIA's commercial activity exceptions, however, permit a foreign sovereign to be sued in a court within the United States, to the same extent as any private individual, when the sovereign is engaged in commercial activity that has a sufficient nexus to the United States. See id. § 1605(a)(2). In this case, while the Bank is generally engaged in commercial activity, we conclude, with one exception, that the Bank's specific commercial activity underlying Plaintiffs' claims does not have a sufficient nexus to the United States. As to the one exception, we agree with the district court that it had subject matter jurisdiction to consider Plaintiffs' claims to the extent they

[*]Honorable Carlos Murguia, United States District Judge of the District of Kansas, sitting by designation.

are based upon the Bank's transfer of $400,000 to a bank in Utah. We, therefore, AFFIRM the district court's jurisdictional rulings. We further AFFIRM the district court's ruling for the Bank on the merits of the claims over which it had jurisdiction. But we REVERSE the district court's dismissal of the Bank's counterclaim and REMAND the counterclaim to the district court for further proceedings.

## I. BACKGROUND[1]

Following a bench trial, the district court made these factual findings:

Plaintiff Orient Mineral Company ("Orient Mineral") is a Nevada corporation. Art Wilson was chairman of Orient Mineral's board of directors.

Wilson met Yue Xiaoqun, also known as David Yue ("Yue"), a Chinese citizen, in 1994 while Yue was in the United States working for the China Foreign Development Company. Yue became a director and shareholder in Orient Mineral. And he interested Wilson in investing in Chinese gold mines.

In 1995, Wilson, aided by Yue, formed Plaintiff Wil-Bao Mineral Company, Ltd. ("Wil-Bao"), a joint venture created under Chinese law by Orient Mineral and a Chinese entity, Jiaocun Gold Company ("Jiaocun Gold'). Jiaocun Gold was wholly owned by the municipality of Jiaocun, China. Wil-Bao's purpose was to acquire gold mining properties in China's Henan province and

---

[1]We GRANT Plaintiffs' motion to file a supplemental appendix in cross-appeals Nos. 05-4037, 05-4048.

then mine, mill and sell the gold extracted from these mines. Wil-Bao was headquartered in Lingbao, China.[2]

Wil-Bao's seven-member board of directors included four individuals associated with Orient Mineral: Wilson (chairman), Yue, F. Thomas Eck, III, Orient Mineral's president and general counsel, and John H. Mahan; and three members associated with Jiaocun Gold. Yue became Wil-Bao's general manager and John Zhang, who was Yue's brother-in-law, became Wil-Bao's finance manager.

Wil-Bao was to have registered capital of $3 million.[3] Of that amount, Orient Mineral was to contribute $2.1 million—$1 million in cash and $1.1 million in mining equipment. Jiaocun Gold would contribute the right to use two existing mine sites and other fixed assets, worth a total of $900,000. As it turned out, Jiaocun Gold did not own the rights to any mines and ultimately contributed nothing to the joint venture.

Orient Mineral convinced R. Ellsworth McKee, a United States citizen from Tennessee, to fund this joint venture. McKee was chairman of the board for McKee Foods Corporation ("McKee Foods"). He was initially leery of this investment opportunity because he was unfamiliar with China and this

---

[2]The record also contains references to this city as Ling Bao and LingBao.

[3]Unless otherwise specified, any reference to sums of money will be in United States dollars.

opportunity involved a fairly risky gold mining venture.[4]  McKee eventually

agreed to invest $3 million, but only under certain terms and conditions designed

to protect McKee's investment.

Those conditions included treating most of McKee's $3 million investment

as a loan to Orient Mineral for Wil-Bao's benefit.[5]  Moreover, Orient Mineral

agreed with McKee to place Preston Jones on Orient Mineral's board of directors,

replacing Mahan.  Jones was McKee Foods' "director of corporate tax" and he

also handled R. Ellsworth McKee's personal finances.  Orient Mineral further

agreed to give Jones "total control of the funds for Orient Mineral

Company," appoint Jones to the Wil-Bao board of directors, and require Jones'

authorization for all Wil-Bao expenditures over $25,000, "at least until such time

as all loan funds had been repaid to Mr. McKee."

The next challenge was to get McKee's $3 million to China in a form that

Wil-Bao could use.  For this, the group turned to the Bank of China.  The Bank is

organized and exists under the laws of the People's Republic of China, has its

---

[4]This venture was actually riskier than McKee realized.  At the time Orient Mineral created Wil-Bao and solicited McKee's financial investment, the Chinese government had imposed a moratorium on moving and milling gold ore. Therefore, while Wil-Bao could mine "some gold," it could not move, mill or sell any gold until the Chinese government lifted the moratorium.  Orient Mineral failed to disclose the then-existing moratorium to its prospective investors, including McKee.  The Chinese government eventually lifted the moratorium in 1997.

[5]McKee loaned Orient Mineral $2.9 million for Wil-Bao's benefit, and agreed to invest an additional $100,000 himself.

5

principal office in Beijing, and operates a "sub-branch" in Lingbao, as well as a branch bank in New York City.  At the time, the Bank was wholly owned and operated by the People's Republic of China.

Yue, who was in China acting as Wil-Bao's general manager, had already made several inquiries at the Bank's Lingbao sub-branch, asking, for instance, whether Wil-Bao could bring equipment, purchased abroad, into China, and about Wil-Bao's ability to convert its profits from the local Chinese currency "to foreign exchange to be remitted abroad."  In May 1996, at Wilson's request, Yue arranged with the Bank's Lingbao sub-branch for a "temporary special holding account" to which Orient Mineral could wire the $3 million it had obtained from McKee.  Also at Wilson's request, Yue asked for and received a letter from the Bank, dated May 14, 1996, which provided:

Dear Mr. Yue Xiaoqun:

Our bank already received your application on May 14, 1996, and we agree to establish in our bank a temporary U.S. Dollar account at the request of your honorable company (Sino-U.S. Joint Venture Henan Wil-Bao Metal Smelting Company, Ltd.).  We now advise the relevant particulars as follows:

Account name: ORIENT MINERAL CO.
Account number: 14833
Bank opening the account: Lingbao City Subbranch, Henan
                          Provincial Branch
                          Bank of China

After the funds are transferred, our bank will be responsible for safekeeping these funds.  Further, Mr. Yue Xiaocun [sic] must bring to our bank the business license of ORIENT MINERAL CO., the company

6

chop,[6] and a company authorization letter, and go through the formalities, so that the funds can be used in the joint venture in accord with arrangements made by the representative of the American party.

(Footnote added.) This letter was written in Chinese and addressed to Yue.

Yue sent to Wilson, in Nevada, the Bank's letter, along with Yue's rough English explanation of the document. Wilson then had a friend who operated a Chinese restaurant translate the letter for him.

In preparation for the transfer of funds to China and pursuant to its agreement with McKee, Orient Mineral's Board of Directors, on May 16, 1996, passed a resolution that, among other things, provided that "Preston Jones shall be the sole and exclusive person to act on behalf of Orient Mineral Co. with respect to the disposition of all funds deposited in the Bank of China, Lingbao Branch of the HeNan Province." The resolution further provided that "the Board of Directors and Orient Mineral Co. shall hold the Bank of China harmless from all claims or liabilities of any kind whatsoever, provided the directions of Preston Jones are followed by said Bank of China." This resolution had the appearance of a formal corporate document, impressed with Orient Mineral's corporate seal, signed by Orient Mineral's president, and attested to by its acting corporate secretary. Further,

[a]ccompanying Orient Mineral's Board Resolution was a letter dated May 16, 1996, and also signed by Eck as Orient Mineral's President. This letter was on Orient Mineral's letterhead and bore the impression

---

[6]"Chop" in this context refers to the company's seal.

7

of its corporate seal. It was addressed to the Bank of China and enclosed the May 16th Board Resolution, which it characterized as authorizing Preston Jones as Orient Mineral's sole and exclusive agent to approve, direct, or otherwise designate the funds on deposit with the Bank pursuant to a wire transfer from McKee. The letter further stated that the May 16th Board Resolution was confirmed and ratified in all respects and that Preston Jones shall have full and complete authority with regard to the disposition of said funds.

On May 21, 1996, Plaintiffs initiated a wire transfer of $3 million from McKee's bank in the United States to the Bank's sub-branch in Lingbao. Jones, Wilson and Eck then traveled to China, where Yue met them and acted as their interpreter.

In keeping with promises made to McKee, the Wil-Bao Board of Directors met in China on May 24, 1996, and adopted a resolution that provided that, until Wil-Bao repaid McKee in full, "Preston Jones shall be appointed as the director of Wil Bao responsible for the management of the financial affairs of Wil Bao with the sole authority to approve any expenditure of Wil Bao in excess of $25,000 U.S. dollars." Unlike Orient Mineral's May 16 Board Resolution, the Wil-Bao resolution made no "reference to the Bank of China; nor does it bear any of the indicia of corporate authority (such as company letterhead, corporate seal imprint, secretary's attestation, officer's cover letter)."

On May 27, 1996, Jones, Wilson, Eck, Yue and John Zhang (Yue's brother-in-law) met with Bank officials in Lingbao. The Americans at the meeting spoke only English, while the Bank's employees attending this meeting

8

spoke only Chinese. Because Yue could speak and understand both languages, he acted as the interpreter for the entire group.

During this meeting, Orient Mineral's President, Eck, gave Bank officials 1) the Orient Mineral Board Resolution directing that only Jones possessed authority to dispose of the Orient Mineral funds that had been wired to the Bank's Lingbao sub-branch; and 2) Eck's letter to the Bank, dated May 16, 1996, reaffirming Jones' sole authority to distribute these funds. Bank officials had these documents translated into Chinese.

Jones then asked Yue to inform the Bank officials that the American group wanted to open a permanent account for Orient Mineral. But Yue instead informed Bank officials that the group wanted to open accounts for Wil-Bao. Yue then misinformed the Americans that Orient Mineral could not open its own account with the Bank because it was not registered to do business in China; they would, instead, have to open an account in the name of the joint venture, Wil-Bao. After some discussion, Jones, Wilson, and Eck agreed to open accounts in the name of Wil-Bao, so long as Jones still retained authority over any Wil-Bao expenditures over $25,000. The Americans then asked Yue to convey to Bank officials that this restriction be placed on the Wil-Bao accounts. The Americans assumed Yue did so. But Bank officials testified that Yue never informed them

9

that this restriction was to be placed on the <u>Wil-Bao</u> accounts.[7]

At Yue's request, the Bank opened two accounts for Wil-Bao, one for U.S. dollars, and the other for the local Chinese currency, Renminbi ("RMB"). Yue completed the account application forms and provided the Bank with three "chops," those of Wil-Bao, Yue, and his bother-in-law Zhang, Wil-Bao's financial director. These three "chops" would be required to negotiate any transaction at the Bank on Wil-Bao's behalf. No other withdrawal restrictions beyond the required three "chops" were placed on either account.

Believing, incorrectly, that he had sole authority to authorize expenditures greater than $25,000 from the Wil-Bao U.S. dollar account, Jones signed a bank transfer slip moving all of Orient Mineral's funds from its temporary account into Wil-Bao's U.S. dollar account. Before transferring the funds, the Bank verified Jones' identity by reviewing his passport.

Jones, Wilson, Eck and Yue met with one of the Bank's officials, Mr. Wang, at the Lingbao sub-branch on May 29, 1996. Yue again acted as interpreter for both sides. During that meeting, the Americans gave Wang the recently approved Wil-Bao resolution indicating Jones had to authorize any

[7]Jones testified that Eck, during this May 27, 1996 meeting, also presented the Bank officials with a copy of the recently approved Wil-Bao resolution, which indicated that Jones had to authorize any expenditure of Wil-Bao funds in excess of $25,000. But the district court found that, "[m]ore likely than not, the May 24th Wil-Bao board resolution was presented to [the Bank's] Mr. Wang at the [later] May <u>29th</u> meeting at the Lingbao Sub-branch of the Bank of China." (Emphasis added.)

10

Wil-Bao expenditure greater than $25,000. In addition, the Americans gave Wang a handwritten note signed by Jones and Yue, by which Jones intended to authorize the transfer of $1.215 million from Wil-Bao's U.S. dollar account to its RMB account for the purchase of a gold mine, among other things.[8] This handwritten note stated:

<u>Authorization for David Yue Only</u>
Transfer Funds inTo Wil-Bao
      5/29/96
Funds AllocaTed For Use

| | |
|---|---|
| Mr. P[e]ng | $500,000- |
| Jiao Cun Town | 450,000- |
| Vehicles | 125,000- |
| Office Equip | 10,000- |
| OperaTing Funds | <u>130,000-</u> |
| | $1,215,000 |

This process confirmed, at least for Jones, his (mis)understanding that the Bank would not pay out funds in excess of $25,000 from the Wil-Bao U.S. dollar account without his authorization. Further confirming Jones' mistaken belief, the Bank, on June 4, 1996, transferred $1.2 million from Wil-Bao's U.S. dollar account to its RMB account, after the Chinese State Administration Exchange Control ("SAEC") approved the transfer.[9]

After returning to the United States, Jones, on several occasions, sent Yue written authorization to transfer funds from the Wil-Bao U.S. dollar account to a

---

[8]Wang does not recall receiving this handwritten note.

[9]The SAEC "is a government agency charged with the regulation of foreign exchange in China."

11

Nevada company, Administrative Systems Corporation ("ASC"), in order to make interest payments owed to McKee. Yue made most of these transfers. But Bank officials testified that the Bank conducted these transactions based, not on Jones' written authorization, but on transfer slips filled out by Yue and accompanied by the three required "chops."

In the meantime, Yue was making other withdrawals from the Wil-Bao accounts, without Jones' knowledge or authorization. For example, on August 22, 1996, the Bank, at Yue's request, wired $400,000 from Wil-Bao's account to Utah's First Zions National Bank for Saren Gaowa's benefit. Gaowa was Yue's wife.

And, on October 18, 1996, Yue transferred $1 million from the Wil-Bao account to an account in another Chinese bank, the International Department of Industrial and Commercial Bank of China ("ICBC"), using these funds to purchase a certificate of deposit ("CD") that would mature in one year. Yue then used the CD as collateral to obtain five loans from the ICBC to Wil-Bao in a total amount of six million RMB. "While a portion of those loan proceeds may have been applied to the acquisition of a . . . mine and the lease of a high capacity mill, the actual disposition of those loan proceeds remains unknown."

In December 1996, Jones sent Yue written authorization to transfer $63,250 to ASC. In response, Yue sent Wilson a letter, written in broken English, indicating that there was no money in the Wil-Bao account to make this transfer if

12

Wil-Bao was to start milling its ore. After receiving this message, Jones and Wilson travelled to China in February 1997. There, Jones tried to review the Wil-Bao books, but was unable to understand them because they were in Chinese. Yue did explain to Jones and Wilson that he had transferred some Wil-Bao funds to the ICBC bank in order to obtain several loans. Neither Wilson nor Jones contacted the Bank or the ICBC to investigate Yue's explanation further. Yue promised to send the Americans a "year-end financial statement" and otherwise "assured" Jones and Wilson " that everything was fine."

Jones and Wilson again traveled to China in June 1997, accompanied by Eck, Wilson's controller, Ken Schmick, and Gayla Zhang, who apparently speaks Chinese and has an accounting background. There, the group discovered that "Wil-Bao's ledgers [were] hopelessly out of balance and not up to date," and that the Wil-Bao accounts with the Bank contained only $21,000.

When confronted with this, Yue explained that he had transferred almost all of the Wil-Bao money to the ICBC. But no one at the ICBC would meet with the American contingent to verify this. Eventually, Yue produced someone purportedly from the ICBC to assure the Americans that they had $1 million in the ICBC. This apparently satisfied the Americans, although Jones expressed some concern about Yue's being able to transfer all of Wil-Bao's money from the Bank to the ICBC without Jones' written authorization. But Jones did not check with the Bank about this.

13

Jones and Wilson, with Gayla Zhang, returned to China in October 1997. There, an ICBC official informed them that there were no Wil-Bao funds in the ICBC because Yue had used all of these funds as collateral for the loans he had obtained. Wilson then removed Yue as Wil-Bao's general manager, and Wilson and Gayla Zhang took over operating the joint venture. The Chinese government prosecuted Yue for embezzlement. He was convicted and sentenced to twelve years' imprisonment.

Orient Mineral and Wil-Bao sued the Bank, Yue and Gaowa in federal district court in Utah, asserting breach of contract and tort claims, and seeking to impose a constructive trust on Gaowa's home in Utah.[10] The Bank, in turn, asserted its immunity as a foreign sovereign. In addition, the Bank alleged a counterclaim based upon the language in Orient Mineral's May 16, 1996 board resolution promising to hold the Bank "harmless from all claims or liabilities of any kind whatsoever, provided the directions of Preston Jones are followed by said Bank." The Bank expressly made its counterclaim contingent on the district court's finding it had jurisdiction to consider Plaintiffs' claims against the Bank.

Following a thirteen-day bench trial, the district court concluded it had subject matter jurisdiction over Plaintiffs' claims only to the extent they were based upon the $400,000 transfer to the Utah bank. The court found for the Bank

---

[10]The district court eventually dismissed the claims against Yue because Plaintiffs were unable to serve him. And Plaintiffs settled their claims against Gaowa at the time of trial.

on the merits of those claims. Plaintiffs appeal (No. 05-4037), challenging several aspects of that decision. The Bank cross-appeals (No. 05-4048), challenging only the district court's decision that it had subject matter over Plaintiffs' claims based upon the $400,000 transfer to the Utah bank.

After the trial, the district court dismissed the Bank's counterclaim with prejudice. The Bank appeals that decision in appeal No. 05-4220.

## II. APPELLATE JURISDICTION

As an initial matter, the parties challenge our jurisdiction to consider these appeals. We conclude we have appellate jurisdiction to consider all three of the appeals before us.

Following trial, the district court, on January 26, 2005, entered judgment in favor of the Bank on Plaintiffs' claims based upon the Bank's transferring $400,000 from Wil-Bao's account in Lingbao to the Utah bank; and dismissed the remainder of Plaintiffs' claims for lack of subject matter jurisdiction. Although the district court's decision did not expressly address the Bank's still-pending contingent counterclaim, the district court, on January 27, entered judgment pursuant to Fed. R. Civ. P. 58(a), and ordered that the Bank recover its "costs" from Plaintiffs.[11]  Treating the district court's decision as a final, appealable order

---

[11]Fed. R. Civ. P. 52(a) provides that, following trial to the court, "judgment shall be entered pursuant to Rule 58." And Rule 58(a)(1) provides, in pertinent part, that "[e]very judgment . . . must be set forth on a separate document."

15

under 28 U.S.C. § 1291,[12] Plaintiffs filed a notice of appeal within thirty days of the entry of judgment (appeal No. 05-4037), and the Bank filed a notice of cross-appeal within fourteen days of Plaintiffs' notice of appeal (appeal No. 05-4048).

In light of the fact that the district court's January 26, 2005 decision did not specifically resolve the Bank's still-pending counterclaim, this court raised concerns about our jurisdiction to consider the parties' cross-appeals, because "a judgment . . . that does not dispose of all claims is not considered a final appealable decision under § 1291," Jackson v. Volvo Trucks N. Am., Inc., 462 F.3d 1234, 1238 (10th Cir. 2006). At this court's suggestion, the parties jointly requested that the district court enter a Fed. R. Civ. P. 54(b) certification permitting them to pursue their cross-appeals even though the district court's decision had not resolved all of the claims pending before it in this case.[13] In

---

[12]28 U.S.C. § 1291 provides that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

[13]Rule 54(b) permits the district court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties" but "only upon an express determination [by the district court] that there is no just reason for delay and upon an express direction for the entry of judgment." (Emphasis added.) Rule 54(b) further provides that

[i]n the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or

(continued...)

16

response to the parties' request, the district court instead dismissed the Bank's counterclaim, presumably with prejudice, indicating that the court had already "finally adjudicated the Bank's remaining counterclaim[]" when it previously entered judgment for the Bank on Plaintiffs' claims.[14]

The district "court's subsequent issuance of an order explicitly adjudicating all remaining claims may cause a case to ripen for appellate review." Jackson, 462 F.3d at 1238 (quotation omitted). That is true here. See Fed. Sav. & Loan Ins. Corp. v. Huff, 851 F.2d 316, 317 (10th Cir. 1988) (en banc). We, therefore, have appellate jurisdiction to consider the parties' cross-appeals, Nos. 05-4037 and 05-4048.

_____

[13](...continued)
parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

[14]The district court did not specify whether its dismissal was with or without prejudice. The Tenth Circuit recognizes a "general rule [] that a party cannot obtain appellate jurisdiction where the district court has dismissed at least one claim without prejudice because the case has not been fully disposed of in the lower court." Jackson, 462 F.3d at 1238 (emphasis added). But here, it is clear that the district court intended to dismiss the Bank's contingent counterclaim with prejudice. In its decision expressly dismissing the Bank's counterclaim, the district court indicated that its earlier decision had in fact "finally adjudicated the Bank's remaining counterclaim[]," because the Bank's counterclaim was contingent on the court's imposing some liability on the Bank, and because the court's decision disposing of all of Plaintiffs' claims did not impose any liability on the Bank. Cf. Styskal v. Weld County Bd. of County Comm'rs, 365 F.3d 855, 858-59 (10th Cir. 2004) (noting dismissal without prejudice means dismissal without barring litigant from refiling; citing Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 505-06 (2001)).

17

In addition, the Bank, in appeal No. 05-4220, timely appealed from the district court's decision explicitly dismissing the Bank's contingent counterclaim and ending this litigation.[15] We, therefore, have appellate jurisdiction to consider that appeal as well. See 28 U.S.C. § 1291.

### III. DISCUSSION

#### A. CROSS-APPEALS: Nos. 05-4037 and 05-4048

**1. Whether, and to what extent, the district court had subject matter jurisdiction over Plaintiffs' claims against the Bank under the FSIA.**

##### a. Standard of review

This court will review de novo the district court's determination of its subject matter jurisdiction under the FSIA, reviewing factual findings for clear error. See Southway v. Cent. Bank of Nigeria, 328 F.3d 1267, 1272 (10th Cir. 2003).

##### b. Background

For most of the time since the United States' inception, foreign sovereigns

---

[15]Plaintiffs argue that the Bank's notice of appeal underlying this separate appeal, No. 05-4220, was untimely. They contend that, because the district court thought it was "finally adjudicating" the Bank's contingent counterclaim at the time the court entered judgment for the Bank on all of Plaintiffs' claims, in January 2005, the Bank should have filed its notice of appeal challenging the district court's (implicit) decision denying the Bank relief on its contingent counterclaim then. But the district court's earlier order did not explicitly address the Bank's counterclaim and so did not put the Bank on notice that it needed to file a notice of appeal at that time. Because the district court, in this case, did not explicitly dismiss the Bank's counterclaim until its order dated July 6, 2005, the Bank's notice of appeal filed within thirty days of that decision was timely. See Fed. R. App. P. 4(a)(1)(A).

18

have enjoyed almost complete immunity from suit in American courts.  See

Republic of Austria v. Altmann, 541 U.S. 677, 688-89 (2004); Argentine Republic

v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 n.1 (1989); Verlinden B.V.

v. Cent. Bank of Nigeria, 461 U.S. 480, 486 (1983).  In 1952, however, the State

Department adopted a more "'restrictive' theory of foreign sovereign immunity."

Verlinden, 461 U.S. at 486-87; see also Altmann, 541 U.S. at 689-90.  Under this

restrictive theory, foreign sovereigns still enjoyed immunity for public or

sovereign acts, but they no longer had unqualified immunity for private or

commercial activity.  See Verlinden, 461 U.S. at 487; see also Altmann, 541 U.S.

at 690; Saudi Arabia v. Nelson, 507 U.S. 349, 359-60 (1993).  Congress codified

this restrictive theory when it enacted the FSIA in 1976.  See Permanent Mission

of India to the United Nations v. City of New York, 127 S. Ct. 2352, 2357 (2007).

The FSIA provides the sole source of American courts' subject matter

jurisdiction over a foreign sovereign.  See Amerada Hess Shipping Co., 488 U.S.

at 435, 439, 443; see also Permanent Mission of India, 127 S. Ct. at 2355; Nelson,

507 U.S. at 355.  A foreign state is still presumptively immune from suit.  See 28

U.S.C. § 1604; see also Permanent Mission of India, 127 S. Ct. at 2355; Nelson,

507 U.S. at 355.  But the FSIA "carves out certain exceptions to its general grant

of immunity."  Altmann, 541 U.S. at 691.  "These exceptions are central to the

Act's functioning: 'At the threshold of every action in a district court against a

foreign state, . . . the court must satisfy itself that one of the exceptions applies,'

19

as 'subject-matter jurisdiction in any such action depends' on that application."

Id. (quoting Verlinden, 461 U.S. at 493-94); see also Amerada Hess Shipping, 488 U.S. at 434-35.

In considering whether a foreign sovereign is immune from suit in the United States under the FSIA, courts employ a burden-shifting analysis. See Southway, 328 F.3d at 1271. The defendant must first establish a prima facie case that it is a sovereign state, creating a rebuttable presumption of immunity. See Cruz v. United States, 387 F. Supp. 2d 1057, 1062 (N.D. Cal. 2005). Once the foreign sovereign makes that prima facie showing of immunity, the plaintiff has the burden of production to make an initial showing that an FSIA exception to foreign immunity applies. See Southway, 328 F.3d at 1271; see also Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993). If the plaintiff makes such a showing implicating an exception, then the foreign sovereign bears the "ultimate burden of proving," by a preponderance of the evidence, that the exception does not apply in that case. Southway, 328 F.3d at 1271.

### c. The FSIA's commercial activity exception

In this case, Plaintiffs do not dispute that the Bank is an instrumentality of a foreign sovereign—the People's Republic of China.[16] See also Voest-Alpine

---

[16]In its appellate brief, the Bank asserts that, in 2004,

the Government of China established Central Huijin Investment Company Limited and converted the Bank into a joint stock company

(continued...)

20

Trading USA Corp. v. Bank of China, 142 F.3d 887, 890 (5th Cir. 1998) ("The Bank of China is an instrumentality of the People's Republic of China."). Therefore, the Bank has made a prima facie showing of immunity. See Southway, 328 F.3d at 1271.

Plaintiffs assert, however, that the FSIA's commercial activity exception, see 28 U.S.C. § 1605(a)(2), applies in this case to give United States courts subject matter jurisdiction. The "commercial activity" exception is the FSIA's "most significant . . . exception[]" to foreign sovereign immunity. Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992). It "is at the heart" of the FSIA's codification of the restrictive theory of foreign sovereign immunity. Joseph F. Morrissey, Simplifying the Foreign Sovereign Immunities Act: If a Sovereign Acts Like a Private Party, Treat It Like One, 5 Chi. J. Int'l L. 675, 682 (Winter 2005); see also Weltover, 504 U.S. at 612-13.

In this case, the parties also do not dispute that the Bank is engaged in commercial activity. See Voest-Alpine Trading, 142 F.3d at 892 (parties did not

[16](...continued)
owned by CHIC. The Bank then became the Bank of China Limited[.] In August 2005, ten percent of the shares of Bank of China Limited was sold to Royal Bank of Scotland, and in September 2005, another ten percent was sold to Temasek Holdings of Singapore.

These changes do not affect this litigation because "instrumentality status [is] determined at the time suit is filed." Dole Food Co. v. Patrickson, 538 U.S. 468, 478 (2003); see also Kirkham v. Societe Air France, 429 F.3d 288, 290 (D.C. Cir. 2005).

21

dispute that "the Bank of China is a foreign state engaged in commercial activity"). Nevertheless, there must also be a sufficient nexus between the Bank's commercial activity and the United States: "For there to be jurisdiction in this case," therefore, Plaintiffs' "action must be 'based upon' some 'commercial activity' by [the Bank] that had 'substantial contact' with the United States within the meaning of the [FSIA]." Nelson, 507 U.S. at 356; see also Morrissey, supra, at 676-77, 683-84; William R. Dorsey, III, Reflections on the Foreign Sovereign Immunities Act After Twenty Years, 28 J. Mar. L. & Com. 257, 264 (1997).

The FSIA's "commercial activity exception is broken down into three clauses," each identifying a sufficient connection to the United States necessary "to satisfy the jurisdictional nexus requirement." Voest-Alpine Trading, 142 F.3d at 892. The FSIA provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of any of the States in any case —
>
> . . . .
>
> in which the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (numbering in brackets added). In this case, Plaintiffs assert that the district court has subject matter jurisdiction over their claims

22

asserted against the Bank under all three clauses of the commercial activity exception.

In addressing whether a federal court has subject matter jurisdiction over Plaintiffs' claims, we must first identify "the particular conduct on which [Plaintiffs'] action is based." Nelson, 507 U.S. at 356 (quotation omitted). That is because, for FSIA purposes, the statutory phrase "based upon," 28 U.S.C. § 1605(a)(2), "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Nelson, 507 U.S. at 357. Our focus, then, must be on the "specific claim[s]" that Plaintiffs assert against the Bank and the "elements of th[ose] claim[s] that, 'if proven, would entitle [Plaintiffs] to relief under [their] theory of the case.'" Globe Nuclear Servs. & Supply (GNSS), Ltd. v. AO Techsnabexport, 376 F.3d 282, 287 (4th Cir. 2004) (quoting Nelson, 507 U.S. at 357).

In this case, although Plaintiffs asserted at least five different theories of recovery against the Bank, all of their claims are based on the Bank's alleged breach of a duty, created contractually or otherwise, 1) to keep safe the funds Orient Mineral wired to its temporary account in the Bank's Lingbao sub-branch, and to disburse those funds only according to Jones' directions; and 2) to require Jones' authorization for any withdrawals from Wil-Bao's accounts in an amount

23

greater than $25,000.[17]

### i. Whether Plaintiffs' claims are "based upon" the Bank's "commercial activity carried on in the United States"

Section 1605(a)(2)'s first clause applies when the "the action is based upon a commercial activity carried on in the United States by the foreign state." "'[C]ommercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The phrase

---

[17]Plaintiffs specifically alleged the following claims against the Bank: 1)  The Bank fraudulently misrepresented to Plaintiffs that it would a) keep Orient Mineral's funds safe in Orient Mineral's temporary account in the Bank's Lingbao sub-branch and disburse those funds only according to Jones' directions; and b) require Jones' authorization for withdrawals from Wil-Bao's accounts in amounts greater than $25,000.  2)  The Bank breached two contracts it had with Plaintiffs:  a)  The Bank, in its May 14, 1996 letter, agreed to keep safe Orient Mineral's funds wired to its temporary account in the Bank's Lingbao sub-branch and to disburse those funds according to Jones' directions.  And, b) on May 27, 1996, the Bank entered into an account agreement with Wil-Bao which required Jones' authorization for withdrawals in amounts greater than $25,000.  3)  The Bank owed Orient Mineral and Wil-Bao, as its customers, duties to exercise care in opening and handling their accounts; to understand and follow its customers' instructions; to be alert to suspicious circumstances; and to prevent fraud.  The Bank was negligent when it breached these duties by permitting Yue to make withdrawals from the Wil-Bao accounts in amounts greater than $25,000 without Jones' authorization.  4)  The Bank conspired with Yue, Gaowa and others to commit fraud against Plaintiffs by a) falsely asserting, in its May 14, 1996 letter, that it would keep Orient Mineral's money safe; and b) "staging" the May 27 meeting between officials from Orient Mineral, Wil-Bao and the Bank, during which the group created the Wil-Bao accounts.  5)  The Bank negligently misrepresented to Plaintiffs, a) in its May 14, 1996 letter, that it would keep safe Orient Mineral's money, wired to its temporary account in the Bank's Lingbao sub-branch; and b) failed to advise Plaintiffs' representatives, during the May 27, 1996 meeting at the Lingbao sub-branch, that the Bank would not follow Plaintiffs' instructions requiring that withdrawals of more than $25,000 from Wil-Bao's accounts have Jones' authorization.

24

"'commercial activity carried on in the United States' means commercial activity carried on by [a foreign] state and having substantial contact with the United States." Id. § 1603(e).

Plaintiffs assert several ways in which the Bank carries on commercial activity in the United States. First, the Bank drafted a letter, dated May 14, 1996, promising to keep safe the funds Orient Mineral wired to its temporary account in the Bank's Lingbao sub-branch until Orient Mineral's representative, Jones, arrived in China. With this letter, according to Plaintiffs, the Bank established an ongoing business relationship with Orient Mineral.

But the evidence established that it was Yue, a director of Orient Mineral and Wil-Bao's manager, who made arrangements with the Bank, in China, for Orient Mineral to wire $3 million into a temporary account in the Bank's Lingbao sub-branch. At Wilson's direction, Yue, in making these arrangements, requested that the Bank draft a letter that would include account routing instructions and a promise to keep Orient Mineral's funds safe until Orient Mineral's representative, Jones, arrived in China. The Bank provided Yue with such a letter, dated May 14, 1996, written in Chinese and addressed to Yue. It was Yue, not the Bank, who sent this letter to Wilson in the United States, along with a rough English explanation. Orient Mineral then responded to the Bank's letter with the Orient Mineral resolution making Jones its sole representative and agreeing to hold the Bank harmless if it followed Jones' directions. Eck also drafted a letter to the

25

Bank reiterating these points. But Eck delivered these two Orient Mineral documents in person to the Bank's Lingbao sub-branch when Eck accompanied Jones to China. This series of events can not be construed as the Bank's carrying on commercial activity in the United States.[18]

Plaintiffs next argue that the Bank carries on commercial activity in the United States by operating a branch Bank in New York City. We agree. See Callejo v. Bancomer, S.A., 764 F.2d 1101, 1105 (5th Cir. 1985) (noting foreign bank "regularly engaged in commercial activity in the United States," where, among other things, bank operated branch bank in Los Angeles). But "the fact that a foreign sovereign is engaged in commercial activity in the United States does not serve as a license for United States courts to entertain all claims against it." Dorsey, supra, at 294; see also id. at 296 (noting that "the test for jurisdiction under" the commercial activity exception's "first clause is something more than

---

[18]Plaintiffs further allege that the Bank's May 14 letter represented an offer to create a contract with Orient Mineral, and that Orient Mineral accepted that contract when it wired $3 million from a Wachovia Bank account in the United States to the temporary account the Bank established for Orient Mineral in its Lingbao sub-branch. Thus, according to Plaintiffs, they created this contract in the United States. The district court agreed.

Even so, the Bank's actions in this regard are insufficient to establish that the Bank was carrying on commercial activity in the United States. The Bank did not take any actions in the United States to negotiate the contract. Rather, it negotiated the arrangements for Orient Mineral's temporary account in China with only Yue, as a representative of Orient Mineral and Wil-Bao. It was Yue who forwarded the Bank's letter offering a contract to the United States. Further, the focus of this contract was centered in China, where it was to be performed.

26

just a 'doing business' test, that is, that the foreign sovereign can be sued in the United States . . . even though there is no specific connection between the lawsuit and the United States"). Rather, Plaintiffs' claims must be "based upon" that commercial activity. See Reiss v. Societe Centrale du Groupe des Assurances Nationales, 235 F.3d 738, 747 (2d Cir. 2000); see also Kirkham, 429 F.3d at 293 (noting that "once a foreign state engages in a commercial activity in the United States, it becomes subject to litigation based upon that activity–just like any other commercial actor") (emphasis added).

Plaintiffs point to the fact that, when McKee transferred $3 million for Orient Mineral, from an American bank to Orient Mineral's temporary account in the Bank's Lingbao sub-branch, that wire transfer went through the Bank's New York branch. And when the Bank transferred Wil-Bao funds back to the United States, as Jones requested, those transfers also may have gone through the New York branch. These connections alone, however, are insufficient to establish subject matter jurisdiction under the first clause of the FSIA's commercial activity exception because none of Plaintiffs' claims against the Bank are "based upon" these particular transactions. See Nelson, 507 U.S. at 356-58[19]; see also

[19]In Nelson, an American hired to work in a Saudi Arabian hospital complained to his supervisors about safety defects in the hospital's oxygen and nitrous oxide lines. See 507 U.S. at 351-52. The plaintiffs (the employee and his wife) alleged that, because he complained, Saudi police officers arrested and tortured the American employee. See id. at 352-53. The plaintiffs sued several Saudi instrumentalities alleging tort claims, including failure to warn the

(continued...)

27

Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1144-46 (D.C. Cir. 1994) (rejecting argument that there was a sufficient nexus between the Iraqi government bank's commercial activity carried on in the United States and claim asserted against the bank by several Irish companies, alleging that the bank had failed to make payments under a letter of credit, even though the bank had made previous payments from accounts the Iraqi bank had in the United States); Gen. Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1382-84 (8th Cir. 1993) (holding that the fact that defendant operated airline that served destinations in the United States did not provide United States courts with subject matter jurisdiction over claims against the defendant that were not based upon its operation of the airline, but were instead based upon the defendant's negotiations to purchase another airline, where negotiations took place "primarily" outside the United States); Wahba v. Nat'l Bank of Egypt, 457 F. Supp. 2d 721, 735 (E.D. Tex. 2006) (holding National Bank of Egypt's specific commercial activity implicated by

---

[19](...continued)
employee of such dangers stemming from his employment by a Saudi hospital. See id. at 353-54. The plaintiffs asserted that the FSIA's commercial activity exception's first clause provided American courts with subject matter jurisdiction over their claims asserted against the Saudi government. See id. at 356. The Supreme Court disagreed, see id. at 363, holding that, although Saudi Arabia had arguably engaged in commercial activity in the United States when it recruited and hired the employee to work in a Saudi hospital, the plaintiffs' claims were not based upon that particular commercial activity or the resulting employment contract. See id. at 351-54, 358-59. Rather, the plaintiffs' claims were instead based upon Saudi Arabia's allegedly tortious conduct, which was not commercial but instead sovereign activity–the exercise of police power. See id. at 358-63.

plaintiffs' claims was financing plaintiffs' businesses in Egypt; the Bank's contact with the United States regarding these particular transactions was only "sporadic"; and, therefore, plaintiffs' claims were not "based on" the Bank's commercial activity in the United States).

Plaintiffs further argue that the Bank's transfer of $400,000 of Wil-Bao's funds to the bank in Utah amounts to the Bank's carrying on commercial activity in the United States. We later conclude that this activity was sufficient to subject the Bank to jurisdiction for this particular act under the third clause of § 1605(a)(2). However, we do not believe this single act constitutes "commercial activity carried on in the United States" by the Bank under the first clause of § 1605(a)(2). The Bank acted within China, not the United States. The consequence of the act was felt in the United States when the Utah bank received the funds but the Utah bank was not acting as an agent of the Bank. Rather, it was acting as an independent, arms-length entity in an ordinary commercial transaction. So, the Utah bank's act in the United States cannot be attributed to the Bank.

For these reasons, Plaintiffs have failed to assert sufficient evidence establishing that their action is "based upon" the Bank's commercial activity "carried on in the United States." The district court, therefore, did not have subject matter jurisdiction over Plaintiffs' claims based upon the commercial activity exception's first clause.

29

**ii. Whether Plaintiffs' claims are based upon "an act" the Bank "performed in the United States in connection with" the Bank's "commercial activity . . . elsewhere."**

Section 1605(a)(2)'s second clause applies when "the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  Under this clause, a "material connection must exist between the act performed in the United States and plaintiff's cause of action."  Pere v. Nuovo Pignone, Inc., 150 F.3d 477, 482 (5th Cir. 1998); see also Grossman, 991 F.2d at 1384; Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 709 (9th Cir. 1992).

In invoking the second clause of the FSIA's commercial activity exception, Plaintiffs rely on the same Bank conduct that Plaintiffs asserted to invoke § 1605(a)(2)'s first clause.  For the same reasons stated above, however, Plaintiffs here have failed to establish that their claims are based upon any action the Bank took in the United States.  See Pere, 150 F.3d at 482; Grossman, 991 F.2d at 1384.

**iii. Whether Plaintiffs' claims are based upon an act the Bank took outside the United States that "cause[d] a direct effect in the United States."**

The commercial activity exception's third clause provides that

[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

30

28 U.S.C. § 1605(a)(2). The district court in this case held that it had jurisdiction under the third clause to consider only Plaintiffs' claims that are based upon the Bank's transferring $400,000 to the Utah bank. We agree.

Although it is clear that the Bank was carrying on commercial activity in China, we must consider here what specific acts the Bank took in China that underlie Plaintiffs' claims. On appeal, Plaintiffs rely primarily on the Bank's conduct in transferring, at Yue's request, $400,000 from Wil-Bao's account in the Bank's Lingbao sub-branch.[20] We address that Bank act first. The Bank's transferring this $400,000 out of Wil-Bao's account was certainly connected with the Bank's commercial activity in China. The dispositive question here, then, is whether this Bank conduct, taken in China, had a direct effect in the United States.

A "direct effect" need not be substantial or foreseeable, but it must be more than trivial. See Weltover, 504 U.S. at 617-18. And it will be sufficiently "'direct' if it follows as an immediate consequence of the defendant's activity." Id. at 618 (quotation, alteration omitted).[21] Applying that reasoning to this case,

---

[20]The Bank acknowledges that "[a]ll of the acts of the Bank at issue here–including its receipt and review of Wil-Bao's transfer request, consultation with the SAEC, and execution of the transfer of $400,000 out of Wil-Bao's U.S. dollar account–were performed in China."

[21]In Weltover, the Argentine government issued bonds that provided, among other things, that Argentina would pay interest and principal due on those bonds in United States dollars through a transfer on the London, Frankfurt, Zurich or

(continued...)

31

it is clear that the Bank's transfer of $400,000 of Wil-Bao's funds from its account in the Bank's Lingbao sub-branch to the Utah bank had a direct effect in the United States—the Utah bank received $400,000 on Gaowa's behalf. This "follow[ed] as an immediate consequence" of the Bank's alleged wrongful conduct in permitting Yue to withdraw $400,000 from Wil-Bao's account without Jones' authorization and to direct those funds be transferred to Utah.[22]

---

[21](...continued)
New York market, at the creditor's election. See 504 U.S. at 609-10. Argentina defaulted on those bonds. See id. at 610. Two creditors who had specifically requested that Argentina pay them in New York sued Argentina for breach of contract in a New York federal court. See id. The Supreme Court adopted the Second Circuit's definition of a "direct effect" as one that "follows as an immediate consequence of the defendant's activity." Id. at 618 (quotation, alteration omitted). The Court had "little difficulty concluding that Argentina's [breach] had a 'direct effect' in the United States" — "[m]oney that was supposed to be delivered to a New York bank for deposit was not forthcoming." Id. at 618-19.

[22]Contrast Weltover and this case with the Tenth Circuit's decision in United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n, where this court held that the plaintiffs had not established that any direct effect had occurred in the United States. See 33 F.3d 1232, 1234, 1237 (10th Cir. 1994). In United World Trade, a Colorado corporation (United World Trade, or "UWT") entered into several agreements in Kazakhstan and Moscow with entities affiliated with the Kazakh government that involved UWT arranging for purchasers for Kazakh oil. See id. at 1234-35 & 1234 n.2. Although these agreements were to be performed in their entirety outside the United States, see id. at 1235-36, 1238, UWT asserted that Kazakhstan's refusal to make all the oil shipments required under these agreements had a direct effect in the United States because: Kazakhstan was to pay UWT in United States dollars, which would have required some United States bank to become involved at some point in the payment process, see id. at 1236-37; UWT incurred expenses and potential liability in the United States when it agreed to indemnify one of the oil buyers after Kazakhstan lost the bill of lading for one of its oil shipments, see id. at 1238; and UWT lost

(continued...)

The Bank suggests that the "direct effect" occurring in the United States must be "legally significant" in order for an American court to have subject matter jurisdiction under the commercial activity exception's third clause. There are courts that have adopted a "legally significant act" test when applying § 1605(a)(2)'s third clause. See Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 240 (2d Cir. 2002); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 931 (2d Cir. 1998); Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 726-27 (9th Cir. 1997). But this test is defined in different ways. Some courts require that the direct effect occurring in the United States be a direct effect caused by legally significant conduct outside the United States. See Virtual Countries, 300 F.3d at 240. That test would be met here. The Bank's permitting Yue to withdraw $400,000 from Wil-Bao's account in Lingbao without Jones' authorization is certainly legally significant to Plaintiffs' claims. Other authority, however, defines the "legally significant act" test to require that a legally significant act occur within the United States. See Adler v. Fed. Republic of Nigeria, 219 F.3d 869, 876 (9th Cir. 2000); see also Virtual Countries, 300 F.3d at 241 (assuming there was a "legally significant direct effect"); cf. Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 817-18 (6th Cir. 2002) (discussing, but

―――――――――――――――――

[22](...continued)
profits in the United States when Kazakhstan breached its contract with UWT; see id. This court rejected all three of these theories as insufficient to establish that Kazakhstan's breaching its contract with UWT had any "direct effect" in the United States. See id. at 1237-38.

33

declining to adopt, legally significant act test); Voeste-Alpine, 142 F.3d at 894-95 (same).

This court has never adopted the "legally significant act" test, and we now explicitly reject that additional, judicially-created criteria to satisfy 28 U.S.C. § 1605(a)(2)'s third clause. In United World Trade, we recognized "that courts often look to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." 33 F.3d at 1239 (quotation omitted). In that case, this court was struggling to resolve the "amorphous . . . issue" of "locat[ing] the site of financial harm to a corporation, . . . where the cause of the injury is an omission." Id. There, we ultimately examined "all of the facts . . . together . . ., including the 'legally significant acts,'" before concluding that the conduct at issue in that case did not produce a direct effect in the United States. Id. We thus will consider the legally significant acts, as well as other relevant facts under the circumstances of a given case, to aid our determination. In doing so, we look to where the legally significant acts occurred as simply one of several means to determine whether a direct effect occurred in the United States. See Morrissey, supra, at 688 (making this observation). In United World Trade, we did not make legally significant acts in the United States a prerequisite for jurisdiction under the third clause of 28 U.S.C. § 1605(a)(2).

We reject engrafting this additional requirement necessary to satisfy

34

§ 1605(a)(2)'s third clause for many reasons. First, the statute's text does not require it. See Voest-Alpine, 142 F.3d at 894; see also Keller, 277 F.3d at 818. And the Supreme Court has counseled against adding extra-legislative requirements to statutory text. See Weltover, 504 U.S. at 618 (rejecting suggestion that § 1605(a)(2) contains "unexpressed requirement[s]"). Second, requiring legally significant acts to occur in the United States would render the second and third clauses of § 1605(a)(2) redundant, as any legally significant act occurring in the United States would likely also satisfy at least the second clause (a foreign sovereign's act in the United States), if not also the first clause (a foreign sovereign's commercial activity carried on in the United States). See Voest-Alpine, 142 F.3d at 895; see also Morrissey, supra, at 677 (noting that the commercial activity exception's first and second clauses address "[s]uits based on actions that actually occur in the United States"). Third, the phrase "legally significant act" is vague and ambiguous, adding nothing to the analysis. Thus, we will simply apply the third clause of § 1605(a)(2) as it is written, without judicial adornment.

In this case, it is clear that the Bank's commercial activity in China produced a "direct effect" in the United States—the transfer of $400,000 to a Utah bank. This case is unlike the circumstances addressed by this court in United World Trade, where the plaintiff alleged a direct effect resulting from the defendants' omission or failure to act, and the effect was only a loss of corporate

profit in the United States, which we held was not a sufficient direct effect. <u>See</u> <u>United World Trade</u>, 33 F.3d at 1236-39. Here, instead, the Bank took affirmative action that caused an effect in the United States—money was received in the United States. And that effect was direct, that is, it followed as "an immediate consequence" of the Bank's permitting Yue to withdraw more than $400,000 from Wil-Bao's Chinese bank account without Jones' authorization, <u>Weltover</u>, 504 U.S. at 618 (quotation omitted), which was the essence of at least one of Plaintiffs' legal claims. For these reasons, the district court correctly held that it had subject matter jurisdiction over Plaintiffs' claims to the extent they were based upon the Bank's transferring $400,000 from Wil-Bao's account to Saren Gaowa's account in a bank in Utah.

On appeal, Plaintiffs also point to the Bank's conduct of drafting its May 14, 1996 letter as an act taken in China, in connection with the Bank's commercial activity there, that had a direct effect in the United States. Because, again, it is clear that this act underlies Plaintiffs' claims, occurred in China and is connected with the Bank's commercial activity in China, the relevant inquiry here is whether that act caused a direct effect in the United States. Under the specific facts of this case, we conclude it did not.

Plaintiffs assert that the Bank's May 14 letter induced them into wiring Orient Mineral's funds to the Bank's Lingbao sub-Branch. But the Bank wrote this letter at Yue's request, pursuant to the terms Yue requested. And Yue

requested these terms at Wilson's insistence. Further, the Bank addressed the letter to Yue, who was Wil-Bao's general manager and a director of Orient Mineral, wrote the letter in Chinese and gave it to Yue in China. It was Yue who sent the Bank's letter to Wilson in the United States, along with Yue's rough explanation in English. Under these circumstances, Orient Mineral's wiring $3 million to the Bank's Lingbao sub-branch was not "an immediate consequence" of the Bank's drafting this May 14 letter addressed and given to Yue in China. Weltover, 504 U.S. at 618 (quotation omitted). The effect the Bank's conduct had in the United States, therefore, was indirect, rather than direct. Orient Mineral's response to the Bank's letter was ultimately the result of Yue's unlawful course of conduct, which constitutes an intervening act not attributable to the Bank.

Plaintiffs also point to the Bank's thrice wiring funds from Wil-Bao's accounts in the Bank's Lingbao sub-branch to the United States through the Bank's New York branch. But Plaintiffs' claims are not based upon the two transfers to the United States that Jones' authorized. And we have already concluded that the Bank's unauthorized transfer of $400,000 to the Utah bank was an act taken in China, in connection with the Bank's commercial activity there, that had a direct effect in the United States. This Utah transfer, therefore, is the only Bank conduct that Plaintiffs rely upon that was taken outside the United States, in connection with the Bank's commercial activity in China, that had a

37

direct effect in the United States.[23]

Plaintiffs, nevertheless, assert that, because the district court had subject matter jurisdiction over Plaintiffs' claims, to the extent they were based upon this $400,000 transfer, that is sufficient to give the district court subject matter jurisdiction over all of Plaintiffs' claims, even those based upon conduct occurring entirely in China. We disagree.

We look first to the FSIA's text. See Permanent Mission of India, 127 S. Ct. at 2356. The FSIA specifically provides, in relevant part, that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in section 1605 to 1607 of this chapter." 28 U.S.C. § 1604 (emphasis added). Thus, "a foreign sovereign is immune from suit in any civil action in any court of the United States unless, and to the extent that, one of the exceptions set forth in §§ 1605-1607 applies." David P. Stewart, Practising Law Inst., Litig. & Admin. Practice Course Handbook Series, Int'l Business Litig. & Arbitration, The Foreign Sovereign Immunities Act 139 (2006) (emphasis added). "[I]f the claim does not fall within one of the exceptions, federal courts lack subject matter jurisdiction." Verlinden, 461 U.S. at 489.

_____

[23]Plaintiffs also rely upon the Bank's failure to notify Jones, "in Tennessee," of these unauthorized transfers. But that omission, as alleged, occurred in the United States, and thus would not satisfy the third clause of § 1605(a)(2). Further, Plaintiffs have never alleged, and there was no evidence presented at trial, suggesting that the Bank had ever promised to notify Jones of any withdrawals from the Wil-Bao account.

The third clause of the commercial activity exception provides subject matter jurisdiction where "the action is based upon . . . an act [occurring] outside the territory of the United States" that has caused "a direct effect in the United States."

28 U.S.C. § 1605(a)(2) (emphasis added). By its very terms, then, § 1605(a)(2)'s third clause gives American courts subject matter jurisdiction over claims stemming from a specific "act" outside the United States that has a direct effect in the United States. In Nelson, the Supreme Court contrasted this language with the language in § 1605(a)(2)'s first clause, which refers instead to an action based upon a foreign sovereign's commercial activity carried on in the United States. See 507 U.S. at 357-58.[24] Thus, the district court correctly held in this case that it did not have subject matter jurisdiction over Plaintiffs' claims that were not based upon the act of the Bank in transferring $400,000 from Wil-Bao's account in the Bank's Lingbao sub-branch to a Utah bank.

---

[24]For this reason, Plaintiffs' reliance on the Eighth Circuit's decision in BP Chemicals Ltd. v. Jiangsu Sopo Corp., 285 F.3d 677 (8th Cir. 2002), is misplaced. In that case, the court was applying § 1605(a)(2)'s first clause, which bases an American court's subject matter jurisdiction on a foreign sovereign's commercial activity carried on in the United States. See 285 F.3d at 686. Because the plaintiff in that case was able to establish that an element of one of its claims involved the foreign sovereign's commercial activity in the United States, the Eighth Circuit held that the district court had subject matter over all of the plaintiff's claims. See id. at 682-84, 688. In fact, all of the claims in BP Chemicals constituted an integrated scheme of "commercial activity," even though they alleged separate acts.

### c.    Conclusion.

For these reasons, we AFFIRM the district court's determination that it had subject matter jurisdiction to consider the merits of Plaintiffs' claims, but only to the extent that they were based upon the $400,000 transfer from Wil-Bao's account in Lingbao to the First Zion's National Bank in Utah.[25]

**2.    Whether the district court erred in ruling for the Bank on the merits of Plaintiffs' claims that were based upon the Bank's transferring $400,000 from Wil-Bao's account to a bank in Utah.**

#### a.    Standard of review

This court will review the district court's factual findings, made after a bench trial, for clear error; and its legal conclusions de novo. See Holdeman v. Devine, 474 F.3d 770, 775 (10th Cir. 2007); see also Fed. R. Civ. P. 52(a).

#### b.    Choice of law

The FSIA does not itself provide the substantive law governing a plaintiff's claims asserted against a foreign sovereign. See Cruz, 387 F. Supp. 2d at 1070-71. Rather, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," except that the

---

[25]In light of this conclusion, we need not address Plaintiffs' argument that the district court abused its discretion in limiting pretrial discovery to facts relevant only to this $400,000 transfer. To the extent that Plaintiffs are instead arguing that the district court denied them discovery on matters pertinent to their claims based upon the $400,000 transfer to Utah, the district court did not abuse its discretion in doing so. See Santana v. City & County of Denver, 488 F.3d 860, 867 (10th Cir. 2007) (noting this court reviews discovery rulings for an abuse of discretion).

foreign sovereign will not be liable for punitive damages. 28 U.S.C. § 1606.[26] In this case, the parties and the district court primarily applied Utah law in addressing Plaintiffs' claims. On appeal, Plaintiffs do not contest the district court's doing so. Thus, we too will apply Utah law, although it is far from clear that would be our conclusion if we conducted a proper choice-of-law analysis. See Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 831 n. 4 (10th Cir. 2005) (applying state law upon which the parties agree).

### c. Merits

#### i. Overview

As explained in greater detail below, the theory of recovery underlying most of Plaintiffs' claims is that the Bank breached its duty to follow Jones' directions in disbursing the $3 million in Orient Mineral's temporary account in the Bank's Lingbao sub-branch. Although Jones sought to maintain control over

---

[26]Section 1606 provides, in full, that,

[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

these funds by requiring his authorization before Yue could withdraw more than $25,000 from the Wil-Bao U.S. dollar account, Jones trusted Yue to convey this restriction to the Bank. Plaintiffs' claims fail primarily because there is no evidence that Yue ever actually conveyed Jones' requested restriction to the Bank. Believing, wrongly, that this $25,000 restriction was in place, Jones transferred Orient Mineral's money into the Wil-Bao accounts. Because the $25,000 restriction Jones sought to place on the Wil-Bao accounts was never shown to have been conveyed to the Bank, the Bank is not liable for Yue's misappropriating Wil-Bao's funds. Plaintiffs' contention that the circumstances surrounding their dealings with the Bank should have put the Bank on notice that Jones sought to restrict Yue's access to Wil-Bao's funds is unavailing. With this in mind, we turn to Plaintiffs' specific arguments asserted on appeal.

### ii. Breach of contract.

Plaintiffs alleged that the Bank, in its May 14, 1996 letter, agreed to keep safe the funds Orient Mineral transferred into its temporary account with the Bank, and further agreed to follow the instructions of Orient Mineral's representative for disbursing those funds. Plaintiffs further alleged that the Bank breached this agreement when it transferred Orient Mineral's money from its temporary account into the newly created Wil-Bao U.S. dollar account without restricting Yue's access to those funds; and further breached this contract when the Bank permitted Yue to make withdrawals in excess of $25,000 from Wil-Bao

42

accounts without Jones' authorization.

On appeal, Plaintiffs challenge the district court's determination that

> Plaintiffs' claim for breach of contract . . . fail[s]. First, the Bank of China performed according to the terms of its agreement with Orient Mineral: the Bank received Orient Mineral's wire transfer, held its funds awaiting Mr. Jones' arrival in China, and then followed Jones' direction to transfer those funds into Wil-Bao's account. The contract between Orient Mineral and the Bank did not address the terms of the contract to be formed between the Wil-Bao joint venture and the Bank.

> Wil-Bao formed its own contract with the Bank of China governing its accounts at the Bank. The terms of that contract did not include a US $25,000 restriction on withdrawals, transfers or remittances from Wil-Bao's U.S. dollar account, or any requirement that the Bank contact Jones to obtain approval to process transactions in the Wil-Bao accounts. Consequently, the processing of the US $400,000 transfer on or about August 28, 1996 without Jones' approval did not breach Wil-Bao's contract with the Bank.

(Footnote omitted.)

To the extent Plaintiffs are challenging the district court's interpretation of the parties' agreements, we review those legal determinations de novo, see Interwest Constr. v. Palmer, 923 P.2d 1350, 1358-59 (Utah 1996), and agree with the district court's construction of the contracts at issue here. To the extent Plaintiffs are challenging the district court's factual findings, we reject those arguments because the trial record fully supports the district court's determination.

Plaintiffs specifically argue that their giving the May 24, 1996 Wil-Bao resolution to Bank officials notified the Bank that Jones wanted to place a

$25,000 restriction on Yue's access to the funds in the Wil-Bao U.S. dollar account. That resolution acknowledged McKee's investment in Wil-Bao, agreed to repay McKee in full before distributing any profits, and agreed to pay McKee an annual bonus of $333,333.33 for the next three years. The resolution went on to "further resolve[] that until all said sums are repaid in full Preston Jones shall be appointed as the director of Wil Bao responsible for the management of the financial affairs of Wil Bao with sole authority to approve any expenditures of Wil Bao in excess of $25,000 US dollars."

The testimony at trial was conflicting as to whether Plaintiffs ever gave the Wil-Bao resolution to Bank officials and, if so, when. The district court found that it was "[m]ore likely than not, [that] the May 24th Wil-Bao board resolution was presented to [the Bank's] Mr. Wang at the May 29th meeting at the Lingbao Sub-branch of the Bank of China."[27] That factual finding is not clearly erroneous. See Watson v. United States, 485 F.3d 1100, 1108 (10th Cir. 2007).

Because the parties created Wil-Bao's accounts on May 27, 1996, the terms of the Wil-Bao resolution, therefore, could not have been incorporated into the

[27]The Bank did not require any board resolution from Wil-Bao to open the Wil-Bao accounts on May 27, 1996. Nevertheless, Jones testified that he had Eck give the Bank officials the Wil-Bao resolution during the May 27 meeting. Wilson testified both that Eck gave the Wil-Bao resolution to Bank officials during the May 27 meeting, and that this occurred instead during the May 29 meeting. Madame Liu, a Bank official who attended the May 27 meeting, and Mr. Wang, another Bank official who attended both the May 27 and May 29 meetings, testified that they do not recall ever seeing the Wil-Bao resolution, at least not until this litigation.

44

terms that governed the Wil-Bao account.  Nor could the Bank, in creating the Wil-Bao accounts, have disregarded a resolution that the Bank had not yet received.

Further, Plaintiffs' act of giving the Wil-Bao resolution to a Bank official on May 29 was not sufficient to put the Bank on notice that Wil-Bao wanted additional restrictions placed on its accounts.  The Wil-Bao resolution was not addressed to the Bank and was not accompanied by any indicia of an official directive, such as a corporate seal or a letter from Wil-Bao's officers.  Even Plaintiffs, in their post-trial arguments before the district court, refer to this resolution as only an "internal" document.  Moreover, although the resolution required Jones' authorization for "any expenditures of Wil-Bao," the resolution did not specifically link that restriction to the Bank or Wil-Bao's accounts with the Bank.

Plaintiffs also point to the note signed by Jones and Yue authorizing Yue to expend $1.2 million.  Jones gave Bank official Wang this note during the May 29 meeting.  Plaintiffs assert that this note also should have put the Bank on notice that Jones wanted a $25,000 restriction on Wil-Bao account expenditures.  That note, however, handwritten on a piece of paper torn from a notebook, was not addressed to the Bank and did not clearly indicate it was to be any sort of authorization for the <u>Bank</u> to take some action.  That note, therefore, would not have put the Bank on notice that Wil-Bao wanted a $25,000 restriction placed on

45

its accounts with the Bank.

For these reasons, the district court did not err in entering judgment for the Bank on Plaintiffs' breach-of-contract claim.

### iii.    Negligence

Plaintiffs also alleged that the Bank was negligent in permitting Yue to misappropriate Wil-Bao's funds.  Under Utah law, "[t]o establish a claim of negligence, the plaintiff must establish four essential elements: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." Webb v. Univ. of Utah, 125 P.3d 906, 909 (Utah 2005) (quotation omitted).

Plaintiffs specifically alleged that the Bank

owes duties to its depositors to exercise due care in opening and handling of its accounts.  Said duties include the exercise of reasonable care to understand and follow the instructions of its customers on account opening, to be alert to suspicious circumstances and fraud in opening and operating accounts, and to prevent fraudulent or unauthorized transfers from said accounts.[28]

(Footnote added.)  Plaintiffs further alleged that the Bank breached these duties owed to Plaintiffs by

(1) failing to follow directions given by Preston Jones as its sole and exclusive representative to maintain its suspense account or open a new

---

[28]On appeal, Plaintiffs also argue that the Bank's May 14 letter created additional duties the Bank owed Orient Mineral.  But for the same reasons mentioned above, we conclude it did not.

46

Orient Mineral account, or alternatively to establish a $25,000 restricted Wil-Bao USD account, in all cases subject to his approval and control; (2) failing to be alert to suspicious circumstances and fraud on account opening and upon transfer of the full $3 million from the suspense account to the Wil-Bao USD account, relying on the interpretation of Yue, who would thereby possess exclusive control; (3) failing to take reasonable safeguards to prevent the unauthorized transfer of funds from the Wil-Bao USD account by Yue in light of the facts known at the Bank at the time of the transfers; and (4) failing to raise regulatory issues or restrictions that required that the transfer not be made, and that regulatory approval was required.

The district court determined that the Bank had not breached any duty owed to Orient Mineral. That determination was not in error.

### iv.    Civil conspiracy to defraud Plaintiffs.

Plaintiffs alleged that the Bank conspired with Yue and Gaowa, among others, to defraud Plaintiffs. "To prove civil conspiracy, five elements must be shown: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."[29] Alta Indus. Ltd. v. Hurst, 846 P.2d 1282, 1290 n. 17 (Utah 1993)

---

[29]As overt acts, Plaintiffs alleged, among other things, that the Bank's May 14, 1996 letter induced Orient Mineral to transfer $3 million to the Bank's Lingbao sub-branch; the conspirators "staged" the May 27 meeting at the Bank between Bank officials and Plaintiffs' representatives; the Bank's officials failed "to perform normal 'know-your-customer' due diligence" at the meeting, and failed to advise Plaintiffs' representatives "of or raise any regulatory issues or restrictions;" the Bank failed to follow Orient Mineral's and Wil-Bao's instructions; illegally opened and operated the Wil-Bao "USD foreign exchange account" in a manner that circumvented oversight by the Chinese government's SAEC; and engaged in "highly suspicious conduct inconsistent with

(continued...)

(quotation omitted). "Further, conspiracy to defraud requires proof of the underlying fraud." Gildea v. Guardian Title Co. of Utah, 970 P.2d 1265, 1271 (Utah 1998).

The district court determined that Plaintiffs had failed to prove any of these required elements. We agree. In particular, there was no evidence presented that the Bank entered into any agreement with the other alleged co-conspirators. Moreover, as we held above, there is no evidence that the Bank acted with the intent to defraud Plaintiffs.

### v. Fraud

Plaintiffs also alleged that the Bank defrauded them by falsely representing, in the Bank's May 14, 1996 letter, that it would keep safe the funds Orient Mineral wired into its temporary account with the Bank, and would follow the instructions of Orient Mineral's representative.

> Under Utah law, to bring a claim sounding in fraud, a party must allege (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

Gold Standard, Inc. v. Getty Oil Co., 915 P.2d 1060, 1066-67 (Utah 1996). Fraud

---

[29](...continued)
professionalism."

must be shown by clear and convincing evidence. See Armed Forces Ins. Exch. v. Harrison, 70 P.3d 35, 43 (Utah 2003); Kuhre v. Goodfellow, 69 P.3d 286, 291 (Utah Ct. App. 2003).

The district court held that Plaintiffs had failed to establish the elements necessary to prove fraud by clear and convincing evidence. We agree. In particular, the record does not show that the Bank knowingly made any false representations of material facts.

### vi.    Negligent misrepresentation

Finally, Plaintiffs alleged that the Bank negligently misrepresented to Orient Mineral that it would keep safe Orient Mineral's funds, transferred into a temporary account with the Bank, and would follow Orient Mineral's representative's instructions in disbursing those funds. Utah courts have held that "where one carelessly or negligently makes a false representation, expecting the other party to rely and act thereon, and the other party reasonably does so and suffers a loss in that transaction, the representor can be held liable" for negligent misrepresentation. Smith v. Frandsen, 94 P.3d 919, 922-23 & 923 n. 1 (Utah 2004) (quotation, alterations omitted). The district court entered judgment for the Bank on this claim as well. It was not error to do so, for the same reasons discussed above.

### c.    Conclusion

The district court did not err in entering judgment for the Bank on

49

Plaintiffs' claims based upon the Bank's transferring $400,000 to a bank in Utah. In light of this conclusion, we need not address Plaintiffs' assertions on appeal arguing that this court should either enter judgment in their favor or remand this case to a new judge.

## B. APPEAL NO. 05-4220

In appeal No. 05-4220, the Bank challenges the district court's decision dismissing the Bank's contingent counterclaim. We review this legal determination de novo. Cf. Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245, 1267 (10th Cir. 2003) (reviewing de novo district court's determination as to whether counterclaim should be dismissed under Fed. R. Civ. P. 12(b)(6) for failing to state a claim on which relief can be granted).

The Bank's counterclaim, asserted against both Orient Mineral and Wil-Bao, was based upon Orient Mineral's resolution, dated May 16, 1996, which provided, in pertinent part: "BE IT FURTHER RESOLVED that the Board of Directors and Orient Mineral Co. shall hold the Bank of China harmless from all claims or liabilities of any kind whatsoever, provided the directions of Preston Jones are followed by said Bank of China."[30] The Bank alleged that it followed Jones' directions, as conveyed by Yue, when the Bank transferred the funds from

---

[30]Although the Bank also originally named as counterclaim-defendants the individual members of both Plaintiffs' boards of directors, the district court dismissed those individuals without prejudice.

50

Orient Mineral's temporary account into the Wil-Bao U.S. dollar account. Despite its following Jones' directions, Plaintiffs pursued this litigation, "subjecting the Bank to potential liability, costs of defense, (including litigation costs and attorneys' fees), and other injury." As relief, the Bank requested that Plaintiffs

> be held liable to the Bank for indemnification of the Bank and to hold the Bank harmless from all claims and liabilities of any kind whatsoever resulting from the Bank's actions in reliance upon the actual or apparent direction of Preston Jones to transfer funds to Wil-Bao Mineral Company Ltd. as represented by the transfer slip [that Jones signed], including but not limited to any liability in this action, the costs and expenses of this action (including the Bank's litigation costs, disbursements, and attorneys' fees).

The Bank made its counterclaim expressly contingent upon the district court's final determination adverse to the Bank on the Bank's affirmative defenses based upon the FSIA, "including lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue." It did so in an effort to preserve its challenges to the district court's jurisdiction and the propriety of venue. The Bank further asserted that,

> in the event of such a final determination adverse to the Bank as to the Bank's aforementioned affirmative defenses based upon the [FSIA], . . . the Bank will at that time seek leave of the Court to further amend this Amended Answer in order to assert claims on behalf of the Bank against the counterclaim-defendants for claims and causes of action other than for indemnification, including at that time any claims the Bank may have for breach of contract, fraud, injury to the Bank's reputation, and other claims for the Bank's out-of-pocket loss, compensatory, consequential, and punitive damages, and other relief.

51

At this time, however, the Bank asserts the following contingent . . . counterclaim solely for the indemnification of the Bank's liability and costs and expenses in this action (including its litigation costs and attorneys' fees) and, as [previously] stated . . . , solely predicated on a final determination adverse to the Bank of the Bank's aforementioned affirmative defenses based upon the [FSIA].

After trial, the district court determined that it had subject matter jurisdiction to consider the merits of Plaintiffs' claims, to the extent they are based upon the Bank's transferring $400,000 from Wil-Bao's account to a bank in Utah.[31]  The condition on which the Bank based its counterclaim had thus occurred.  Nevertheless, after entering judgment for the Bank on Plaintiffs' claims stemming from the $400,000 transfer and dismissing the rest of Plaintiffs' claims for lack of subject matter jurisdiction, the district court also dismissed the Bank's counterclaim with prejudice.

In doing so, the court noted that, after it entered judgment for the Bank on Plaintiffs' claims, "[t]he Bank did not thereafter seek leave to amend the contingent counterclaim to add any additional claims against any party."  That is true.  But, while the Bank, in pleading its counterclaim, had left open the possibility that it might amend its answer to assert "claims and causes of action

---

[31]Plaintiffs argue that the district court resolved the issue of subject matter jurisdiction prior to the trial.  But the pretrial order specifically noted that the Bank contested the court's subject matter jurisdiction, and that one of the legal issues to be resolved at trial was whether the district court had "subject matter and personal jurisdiction over the Bank of China arising out of its wire transfer of $400,000 to the United States, viz., to Zions First National Bank for the benefit of Saren Gaowa, on August 22, 1996."

52

other than for indemnification," the Bank also clearly pled its contingent counterclaim against Plaintiffs for indemnification for attorneys' fees.

The district court concluded that its decision awarding the Bank its costs, pursuant to Fed. R. Civ. P. 54(d)(1), "afforded relief concurrent with that sought by the Bank's counterclaim." We disagree. In this case, the district court awarded the Bank a total of $22,577.44 in costs. That amount included court and witness fees, and costs for trial transcripts, depositions and copying. The court's award of costs did not include attorneys' fees, which the Bank specifically requested as relief in its counterclaim. The district court's award of costs thus did not award the Bank the full measure of relief it sought in its counterclaim.

It is far from clear whether Orient Mineral's resolution of May 16, 1996, agreeing to hold the Bank "harmless from all claims or liabilities of any kind," includes the Bank's expenditure for its own attorneys' fees. However, the district court never reached the merits of the matter. Instead, the district court erroneously rejected the claim, believing that its award to the Bank of its costs gave the Bank all the relief it was seeking in the counterclaim. We do not intimate anything at this time about the merits of the Bank's claim for attorneys' fees, but that matter should be considered in the first instance by the district court.

We, therefore, remand that claim to the district court for consideration of the Bank's counterclaim for attorneys' fees. Although in their appeal

53

No. 05-4037, Plaintiffs request that we vacate the district court's judgment entered in the Bank's favor and remand to a new judge, they do not make that same request in this appeal, No. 05-4220.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's determination that it had subject matter jurisdiction to consider Plaintiffs' claims to the extent they were based upon the Bank's transferring $400,000 to a bank in Utah, and that the court lacked jurisdiction to consider Plaintiffs' other claims asserted against the Bank. We also AFFIRM the district court's judgment in the Bank's favor on the merits of the claims involving that $400,000 transfer to Utah. But we REVERSE the district court's dismissal of the Bank's counterclaim and REMAND that claim to the district court for further proceedings consistent with this opinion.